(Decided 12th March, 1886.)

---

ROBERT GARRETT vs. HENRY JANES.

*Municipal Corporation—Highway—Acts of 1833, ch. 180, and 1854, ch. 9—No. 59, of the Revised Ordinances of 1858, of the City of Baltimore—Mount Vernon Place—Authority of the Baltimore City Code of 1879—Compilation of Ordinances—Ornamental Portico—Damnum absque injuria—Interference with Prospect.*

The Act of 1833, ch. 180, conferred upon the Mayor and City Council of Baltimore, power to pass ordinances regulating the limits within which it should be lawful to erect steps, porticos or porches, or other architectural ornaments to houses fronting on Mount Vernon or Washington Place. The Act of 1854, ch. 9, empowered the Mayor and City Council of Baltimore to pass ordinances regulating the limits within which it should thereafter be lawful to erect steps, porticos, porches, bulk windows, or other architectural ornaments to houses fronting on any of the streets, lanes or alleys of the city. HELD:

That the Act of 1854, did not take away the power conferred by the Act of 1833; it simply enlarged the powers already bestowed as to a part of the city to embrace the whole of it.

The special ordinance of 1858, passed in pursuance of the Act of 1833, ch. 180, and making it unlawful for any person to erect or set up any porticos, steps or any other ornamental structure whatever on Mount Vernon Place, a greater distance into the Place, than nine feet from the building line thereof, is not repealed by the

Garrett *vs.* Janes.

general ordinance of 1874, *fixing* the limit that any steps, porch or portico may encroach from the building line upon any of the streets or alleys at one-third of the width of the foot-way.

But, assuming that the ordinance of 1874, operated a repeal of the ordinance of 1858, the latter ordinance was revived by re-enactment in the adoption of the City Code of 1879.

It is competent for a municipal Legislature by a single ordinance to declare any compilation of ordinances or proposed ordinances to be in force, in the absence of a statutory prohibition.

The Baltimore City Code of 1879, embodying the ordinances of 1858 and 1874, has been recognized as containing the ordinances valid at its adoption, in the subsequent legislation of the city, and has been relied on by this Court in numerous cases as undoubted authority.

The structure in front of the appellant's house on Mount Vernon Place, extends within a fraction of nine feet from the building line of his house; is rectangular or nearly so in shape, has an elevation of about twenty-two feet from the ground, with a balustrade of two feet additional, with a length of some twenty-two feet. The approach is by steps at the east end, and through it an entrance is gained to the main hall through three arcades or doorways set in the wall on the building line of the house, and susceptible of being left open or closed by doors or hangings. It is built of brown stone, as the house is, and inclosed, having two stained-glass windows and an ornamental panel in front, and another stained-glass window in the west end. Its primary use and purpose is a means of access to the building through the three doorways, which are abreast of and commands the hall; and this is essentially an enclosed porch or portico for that purpose. The testimony was conclusive as to the essential character of the structure being that of an entrance way, and as to its ornamental effect. On a bill filed by the appellee charging that the structure in front of the appellant's house was a nuisance in taking a portion of the highway reserved for the public; that it deprived him of sunshine, air and view, greatly diminished the value of his property, and prevented his comfortable enjoyment thereof, and asking for the abatement and removal of the structure, it was HELD:

1st. That the structure complained of was permissible under the ordinance of 1858, in not exceeding the limit of nine feet, and in falling within the terms of "portico, steps, or any other ornamental structure."

2nd. That the structure being lawful, the complainant was not enti-
tled to relief, even though some measure of obstruction to his light,
or other injury, resulted from its erection; such damage being
*damnum absque injuria.*

There is no remedy, apart from contract, for mere interference with
prospect or view, it not being an incident of the estate.

APPEAL from the Circuit Court of Baltimore City.

The appellee filed his bill on the 24th of November,
1884, in which he alleged in substance that the appellant
was engaged in erecting his house on Mount Vernon
Place, in violation of law, in that the entrance thereto
extended on the pavement in front thereof beyond the
distance prescribed by law. The bill alleged that the
said structure was a nuisance, by reason of its taking a
portion of the highway reserved for the public; that this
action was an injury to him, in that it deprived him of
sunshine, air and view, that thereby the value of his prop-
erty was greatly diminished, and his comfortable enjoy-
ment thereof was prevented. He prayed for an injunction
to restrain such erection, and for the abatement and re-
moval of the structure complained of. The answer of the
defendant, filed on the 1st of December, 1884, alleged
that his entire action in the premises was legal; that the
erection of the portico or ornamental structure was within
the distance prescribed by the ordinance of the City of
Baltimore, approved the 5th of June, 1858, being No. 59
of the "Revised Ordinances" of that year, which was
passed under special authority of the Act of 1833, ch. 180;
that the structure complained of was not a nuisance to
the public, and did not interfere with the complainant's
enjoyment of his property; that, prior to the erection of
the same, the plans were submitted to the complainant,
and were explained to him, and no objection was made to
the same; that the defendant had proceeded in the con-
struction of his house for a period of more than two

months, without objection from the complainant, and had expended large sums of money thereon. A mass of testimony was taken, and after hearing, the Court (DUFFY, J.) was of opinion that the complainant was entitled to the relief prayed, and decreed that the entire structure complained of, should be abated. From this decree the defendant appealed.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, RITCHIE, and BRYAN, J.

*E. J. D. Cross,* and *John K. Cowen,* for the appellant.

*J. Southgate Lemon,* and *John Henry Keene, Jr.,* for the appellee.

RITCHIE, J., delivered the opinion of the Court.

The controlling question in this case, and the only one, after full consideration, we deem it necessary to dwell upon, is whether the structure complained of is in respect of the distance it projects upon the sidewalk, and of its architectural character, authorized by an ordinance of Baltimore City.

The Act of 1833, ch. 180, empowered the Mayor and City Council to pass ordinances regulating the limits within which it should be lawful to erect *steps, porticos or porches or other architectural ornaments* to houses fronting on *Mount Vernon or Washington Place.* The first ordinance passed in pursuance of this Act was No. 55, of 1850; and the same regulations contained therein were re-enacted in 1858, and numbered 59 in the volume of "*Revised Ordinances*" of that year; the difference between the latter and that of 1850 being merely in the preambles, but in which they both refer to the Act of 1833 as their authority. The enacting provision of the ordinance of 1858 is: "It shall not be lawful for any person to erect or set up *any*

*portico, steps or any other ornamental structure whatever* on Mount Vernon Place a greater distance into the *Place* than nine feet, measuring from the building line thereof."

The width of Mount Vernon Place is two hundred feet, and of its sidewalks, eighteen feet.

It is contended by the appellee that this municipal permission to encroach with any portico, steps or any other ornamental structure upon Mount Vernon Place nine feet, which is half the width of the pavement, has been repealed by the Act of 1854, ch. 9, and the Ordinance No. 36, of 1874, adopted thereafter. This Act of 1854 conferred on the Mayor and City Council the power of regulating the limits within which it should be lawful to erect *steps,* porticos, bulk windows or other architectural ornaments to houses fronting on *any of the streets, lanes or alleys* of the city. This Act is codified as *sec.* 864 *of Art.* 4, *of Public Local Laws.* The ordinance of 1874 fixes the limit that any steps, porch or portico may encroach from the building line upon any of the streets or alleys at *one-third* the width of the foot-way ; and repeals all "inconsistent ordinances."

The operation of the Act of 1854 did not, we think, take away the power conferred by the Act of 1833. It simply enlarged the power already bestowed as to a part of the city to embrace the whole of it. The power having already been given to regulate porches, &c., in Mount Vernon Place, a fair presumption is, that this later Act was intended to apply to that portion of the city for which no such power had been given ; and that, hence, the use of the words, " streets, lanes and alleys," was not meant to embrace the thoroughfares of Mount Vernon Place, already provided for. Indeed, the designation of Mount Vernon Place as a "Place" tends to support this contra-distinction. It is a locality of unusually spacious dimensions, and having special requirements as the site of the Washington Monument.

The same observations are equally applicable to the ordinance of 1874, founded on the statute.

But whatever might be the true construction of the ordinance of 1874, if it were the last act of municipal legislation on the subject to which it relates, or even assuming that it operated a repeal of the ordinance of 1858, this latter ordinance was revived by re-enactment in the adoption of the City Code of 1879. Both these ordinances are embodied in this Code; and all the ordinances therein set out, were by a special and comprehensive ordinance enacted to be valid and operative as such. That it is competent for a municipal Legislature by a single ordinance to declare any compilation of ordinances or proposed ordinances in force, in the absence of a statutory prohibition, we do not doubt. Such a power has been too generally exercised, with implied if not express recognition by the Courts to be now questioned.

The Baltimore City Code of 1879, has been recognized as the repository of the ordinances, valid at its adoption, in the subsequent city legislation, and has been cited by parties and relied on by this Court in numerous cases as of undoubted authority. To deny the operative effect of a comprehensive ordinance of this kind, would practically be to deprive a city of the great utility of a Code.

That the Code of 1879 was duly adopted, is apparent from the ordinances published with it. Section 48 of Article 37, Public General Laws, provides, that the ordinances and resolutions of the Mayor and City Council of Baltimore, may be read in evidence from the printed volumes published by the authority of said corporation. That the "printed volumes" are published by authority, we think it competent to gather from the volumes as they appear in print; the object of the law being to remove the delay and expense incident to the production of manuscript originals, where the published volumes purport to be authoritative.

There is no specific reference to the ordinance allowing "any portico, steps, or any other ornamental structure whatever," to extend nine feet into Mount Vernon Place, in that clause of the ordinance of 1874, which repeals "inconsistent ordinances;" and regarding the former as a special and the latter as a general ordinance, they should be considered as in pari materia. They are not inherently incompatible. The general rule in the construction of statutes—applicable alike to the Act of 1854 and the ordinance of 1874—is, that a later one of a general nature does not effect the repeal of a special one, unless direct reference is made to the latter with that intent, or in terms they are so so irreconcilable that a repeal by implication is manifest.

Sedgwick on Con. of Stat. and Constit. Law, (2nd Ed.,) p. 87, &c., thus states the rule:

"In regard to the mode in which laws may be repealed by subsequent legislation, it is laid down as a rule, that a general statute without negative words, will not repeal the particular provisions of a former one, unless the two acts are irreconcilably inconsistent, as for instance, the Statute 5 Elizabeth, c. 4, that none shall use a trade without being an apprentice, did not take away the previous Statute 4 and 5 Philip and Mary, c. 5, declaring that no weaver shall use, &c. The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms or treating the subject in a general manner, and not expressly contradicting the original Act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter Act such a construction in order that its words shall have any meaning at all. So when an Act of Parliament had authorized individuals to inclose and embank portions of the soil under the river Thames, and had declared that

such land should be free from all taxes and assessments whatsoever. The land tax Act, subsequently passed, by general words embraced all the lands in the kingdom; and the question came before the King's Bench, whether the land mentioned in the former Act had been legally taxed, and it was held that the tax was illegal."

We see no difficulty in the standing together of a special ordinance adapted to a particular locality, such as Mount Vernon Place, and a general one applicable to the streets and alleys of the city at large. The need of such discrimination is apparent. The necessities of thoroughfares such as Baltimore or Pratt street, for instance, or of those adjacent to markets or wharves, devoted to business and thronged with pedestrians, and of streets and alleys as generally used, are not similar to those of Places or Squares set apart for ornament and relief from the crowds and activities of commerce. As to the former, facility of passage along the sidewalks is a paramount requirement, while as to the latter, it is in furtherance of the purpose to render them attractive, to give more freedom to the exercise of private taste for adornment in their vicinity. In a city noted for its monuments, municipal legislation peculiar to their neighborhood would seem indispensable; and we regard the ordinance allowing steps, porticos, or any other ornamental structure to extend nine feet into Mount Vernon Place a valid and reasonable exercise of statutory power, derivable from the Act of 1854, even if we assume it to have repealed that of 1833.

Regarding this ordinance of the City Code of 1879, as in force, the next inquiry is, whether the structure in front of appellant's building line on Mount Vernon Place is within its terms.

This structure extends within a fraction of nine feet from the front or building line of appellant's house, is rectangular or nearly so in shape, has an elevation of about twenty-two feet from the ground, with a balustrade of two

Garrett vs. Janes.

feet additional, the whole being about the height of the
first story, with a length of some twenty-two feet, and
ending on the side of plaintiff's house, nearly nine feet
from the dividing line between him and defendant, and
about eleven feet and a half from plaintiff's window. The
approach is by steps at the east end, and through it an
entrance is gained to the main hall, with which it corres-
ponds in width, through three arcades or doorways, set in
the wall on the building line of the house, and susceptible
of being left open or closed by doors or hangings. It is
built of brownstone, as the house is, and enclosed, having
two stained glass windows and an ornamental panel in
front, and another stained glass window in the west end.
While some other and more customary mode of entrance
and one unenclosed, could have been selected, this is the
main entrance-way to defendant's house adopted as such;
and while, from being enclosed, the doorways or arches
through which visitors or inmates pass from this entrance-
way into the hall or building proper may remain open, its
primary use and purpose is a means of access to the build-
ing through the three doorways which are abreast of and
command the hall; and thus is essentially an enclosed
porch or portico for that purpose. That the hall of a
house should be constructed with three doorways, com-
manding its entire breadth instead of one, is simply a
matter of choice in the builder, and is not prohibited; and
there is no requirement that they shall be exposed to view,
nor is it forbidden that they may be protected by enclos-
ing the platform or porch by which access to them is
reached. That such a structure is permissible is clear
from its not transcending the limit of nine feet from the
building line, and falling within the terms of "portico,
steps or any other ornamental structure." From the use
of these words, no limitations seem to be imposed upon
the preference or taste of the builder, except that in the
mode of providing an entrance to his house, he shall not

erect what will offend the eye, but so construct it that it shall be architecturally an ornament, and thus contribute to enhance the beauty of the neighborhood and city. To impose no restrictions but the standard of adornment, was a wise latitude looking to the changes in tastes and architectural modes and styles, that time might be expected to bring.

The testimony is conclusive as to the essential character of the structure being that of an entrance-way, and as to its ornamental effect. A number of architects were examined on both sides, and the tenor of their opinions as experts was the same. Wyatt, one of the witnesses, says: " The most accurate designation for it, I should consider, would be an enclosed porch or vestibule. I consider it highly ornamental." Niernsee, another, says: "It would certainly come under the term ornamental structure." Wilson says: "I should call it an enclosed porch. It harmonizes perfectly in detail and style." Pennington says: " The projection I consider a feature, forming the main entrance-way to the house, and would term it an enclosed porch, forming on the inside a vestibule to the main hall. I consider the design of the porch in harmony with the rest of the building." Architects from New York testify to the same effect. Cady says: " The projection is designated in New York as a stoop, in some other places as a porch. The porch is to make an effective and ornamental entrance to the building and to protect the steps and entrance from the weather. It seems to harmonize perfectly with the design of the said building. I have seen many residences in New York with similar projections." Haight says: " The projection appears to be an enclosed porch. The purpose is to give access to and adorn the building. It seems to be in harmony with the architecture of the building, and I know of residences in New York and elsewhere having similar projections." Post says: " It is an enclosed porch, it is

an entrance to the house and a protection to the doorway. It also emphasizes the main entrance of the house. I think it harmonizes thoroughly with the design, and is a very handsome feature." Robertson says: "I should term the projection an enclosed porch. Its use is to give a covered entrance to the house, and its purpose is to serve as an ornamental structure. I should say that in the main it harmonizes with the design, and is not out of proportion to the general mass of the front." It is true that some of the plaintiff's witnesses called it a vestibule; but others term it an enclosed porch, while its ornamental character is generally conceded. We do not concur in the idea that the ordinance, from using the descriptive terms, "portico, steps," &c., and not mentioning porch, meant to forbid the erection of porches, or used "portico" in a technical sense, as distinguishing it from porch, piazza, verandah or any other equivalent mode of entrance, but in a generic sense and as synonymous. Besides, the words, or "any other ornamental structure," would include a porch, if handsome, whether enclosed or unenclosed, if not implied in the word portico.

Its primary character being an enclosed porch, we do not think its subsidiary uses can destroy its essential nature. The enclosing of a portico or porch is not forbidden. An enclosed one has advantages in respect of the weather and certain forms of embellishments, and admits of the doorways to the building proper being left open, and of freer access between the hall and the porch, than would be possible if the latter were left exposed to the weather. But being enclosed does not render it any less the main entrance-way. And so in regard to its projection; being lawful to extend it as the means of entrance nine feet into the sidewalk, its foundation is lawful to support it that distance from the building line; and when laid for that purpose, such purpose is not affected by the incident of the walls being either built entirely solid, or having win-

dows cut in them to secure a subsidiary use inside. We do not think it would remain a porch if the foundation walls were left solid and become a bay window if light were let through apertures made therein; provided the harmonious character and use of the structure as a porch were not altered thereby. The subordinate uses which may be made of a structure will not supersede its essential character. The incidental or inferior features will not of necessity be inconsistent with the maintenance of its dominating and original impress.

This porch being, therefore, in its extent from the building line, and in its ornamental effect a lawful structure, it follows that the plaintiff, even if some measure of obstruction to his light or other injury, is consequent upon its erection, is not entitled to relief; such damage is *damnum absque injuria.* The inconvenience suffered is that incident to residing in a city, where houses are necessarily close together, and the legitimate use of his property by a neighbor will unavoidably often cause discomfort, and where he in turn will suffer inconvenience from the same cause. It often occurs that it would be more agreeable if next door there were not a tree, or an awning or a signboard to obstruct the light; but where such obstructions rightfully exist, they afford no ground for legal redress.

As to any interruption of the plaintiff's facilities of outlook in the sense of view merely, it has been long ago decided that for mere interference with prospect, it not being an incident of the estate, no remedy lies apart from contract. *Aldred's Case,* 9 *Coke,* 59; *Butt vs. Imperial Gas Co., L. R.,* 2 *Ch. Appeals,* 160.

*Decree reversed, and*
*bill dismissed.*

(Decided 9th April, 1886.)


BRYAN, J., dissented.