TOWN OF BRISTOL *v.* EDSON B. PALMER.

May Term, 1909.

PRESENT: ROWELL, C. J., MUNSON, WATSON, AND HASELTON, JJ.

Opinion filed November 12, 1909.

*Nuisance—Waters and Watercourses—Dams—Encroachment on Highway—Bridges—Injunction—De Minimis Non Curat Lex—Application of Rule.*

There is considerable hesitation in granting an injunction when it is sought to forbid a person the use of his own property in the prosecution of a lawful industry in a careful manner, on the ground that such use is nevertheless a nuisance.

The owner of a water power below a highway bridge spanning a river, having the right to dam the stream below the bridge only to a height that would not set the water back so as to change its natural flow beneath the bridge, began in 1900 to build a dam beneath the bridge. The work was under water till 1903, when it was completed and extended from abutment to abutment of the bridge. The selectmen first learned of the dam when it was finished, and then notified the owner that he had no right to build it, which he denied. No permission had ever been given to maintain the dam, which caused washouts around the abutments of the bridge. The removal of the dam would injure the owner about $3,000, the washouts that led to the suit to enjoin the continuance of the dam caused $225 damage, and the annual damage to the bridge

caused by the maintenance of the dam did not exceed $25. *Held*, that the owner built the dam at his peril; that neither the doctrine that the law does not care for trifles, nor the doctrine of comparative negligence, would apply; and that the town could enjoin the maintenance of the dam.

Under the express provisions of P. S. 4045, 4046, neither can any right within the limits of a public highway be acquired by possession, nor a public easement in a stream be lost or abridged by prescription.

APPEAL IN CHANCERY. Heard on pleadings and master's report at the June Term, 1908, Addison County, *Powers,* Chancellor. Decree for the orator. The defendant appealed. The opinion states the case.

*Charles I. Button* and *William H. Bliss* for the orator.

The doctrine of comparative interest and injury should not be invoked in this case. While the dam was being built it was under water and its existence unknown to the orator or its selectmen. As soon as the dam was discovered, the defendant was immediately notified by the selectmen of the objections of the town and of their intention to protect the interest of the town. If defendant afterwards incurred further expense, he did it with his eyes open and should not be permitted to defend now by showing that the removal of the dam will cause him financial loss. *Tucker* v. *Howard,* 128 Mass. 261; *Brande* v. *Grace,* 154 Mass. 210; *Ives* v. *Edison,* 124 Mich. 402; *Walter* v. *McElroy,* 151 Pa. St. 549; *Davis* v. *Fuller,* 12 Vt. 191; *Sullivan* v. *Jones etc. Co.,* 208 Pa. St. 540; *Royce* v. *Carpenter,* 80 Vt. 37; *Woolen Co.* v. *Newton,* 57 Vt. 468; *Dutton* v. *Stoughton,* 79 Vt. 361.

Where a dam creates a public nuisance, the right to maintain it cannot be acquired by prescription; so the right to maintain a dam which is injurious to public rights on a navigable or floatable stream cannot be acquired by prescription. 8 Am. & Eng. Enc. 713. The general rule is that a riparian owner who erects a dam is responsible for all the injury caused by it at ordinary stages of water or in times of ordinary, usual and expected freshets. But if a dam backs water on another's land at ordinary stages of water and at times of expected freshets, the owner will

also be liable for such injuries as may be caused by the dam in the extraordinary freshets. *Cowles* v. *Kidder*, 24 N. H. 364; *Humphrey* v. *Irvin*, 4 Cent. Rep. 685; 8 Am. & Eng. Enc. 714; *Johns* v. *Stevens et al.*, 3 Vt. 308. A dam owner is liable for the injury which results from his dam's flooding a public highway. *New Salem* v. *Eagle Mills Co.*, 138 Mass. 8; *Cheshire* v. *Adams etc. Co.*, 119 Mass. 356; *State* v. *Ousatonic Water Co.*, 51 Conn. 137; *Inhabitants of Middlefield* v. *Church Mills Knitting Co.*, 160 Mass. 267.

*Frank L. Fish* and *James B. Donoway* for the defendant.

The doctrine of comparative negligence is a favored one, and should apply in this case. Kerr on Injunctions, p. 340; *Curtis* v. *Winslow*, 38 Vt. 690; *Cummings et al.* v. *Barrett et al.*, 10 Cush. 186; *Quackenbush* v. *Vanwibber*, 29 Am. Dec. 716; *Jerome* v. *Ross*, 11 Am. Dec. 484; *Bigelow* v. *Hartford Bridge Co.*, 36 Am. Dec. 562; *Richardson's Appeal*, 98 Am. Dec. 202; 22 Cyc. 783.

Equity will not afford relief for an alleged nuisance, where, as here, the damages can be accurately estimated, and the remedy at law is adequate. *Ottaquechee Woolen Co.* v. *Newton*, 57 Vt. 451. Nor will the law afford relief in such cases where the injury is trivial. Angell on Water Courses, §§117, 118.

An investment of several thousand dollars was made by the defendant under the eye of the town officials in an enterprise which depended for its success wholly on the dam. This is evidence of acquiescence on the part of the town and should be given special weight against the town although its right may have been violated, the injury to be caused the defendant by the injunction being much greater than the injury to the town. *Herr* v. *Central Kentucky Lunatic Asylum*, 110 Ky. 282; *Gray* v. *Patterson*, 45 Atl. 995; *Grey* v. *Ohio R. Co.*, 1 Grant 412; *Pettibone* v. *LaCrosse etc. R. Co.*, 14 Wis. 443.

HASELTON, J. This was an injunction bill with a prayer for damages to be determined on an accounting. The case was heard in the court of chancery on the report of a special master, and comes here on an appeal from a decree in favor of the **orator.**

The New Haven River runs through the town of Bristol. Across it is a certain covered bridge, known as the Lower Notch Bridge, that is part of a public highway, and it is conceded by the defendant that the highway including the bridge was legally established in 1850. At the point in question the bridge runs practically east and west, and the river runs under it in a southerly direction. Since 1850, and indeed since 1842, this bridge has been maintained at all times where it is now except that as the master states, "The west end may have swung a foot or two more or less up or down stream."

In 1900, the defendant commenced to build a dam immediately under the south side of the bridge. The work was under water until 1903, when the defendant completed the building of the dam, and when for the first time the selectmen of Bristol learned of the structure. The dam was tied to, or built up, against each abutment of the bridge. The height of the dam was four or five feet above the natural level of the water. When, in 1903, for the first time, the selectmen learned of the dam, they went to the place and ordered employees of the defendant whom they found there to stop work on the dam. The defendant was informed of this action, and subsequently the selectmen called upon the defendant himself and told him that he had no right to build the dam. The defendant claimed that he had such right basing his claim upon grounds which will hereinafter be referred to. His claimed rights the selectmen denied. The defendant was informed that the matter had been placed in the hands of the town agent for investigation. The matter ran on until 1905, when the town employed the defendant to raise the west end of the bridge about two feet and to put in a supporting wing wall. At this time the town officers and the defendant had talk about the dam but no permission to maintain it was given the defendant. In August, 1906, during a severe freshet, the wing wall at the south end of the west abutment went out, and one side of the travelled portion of the highway caved in. In the following September, the bill in this case was brought. With reference to the dam in its relation to the bridge the master reports: "As this dam from abutment to abutment under the bridge must have caused the water to rise higher upon the abut-·ments, it would thereby cause the water to run through the stones and saturate and percolate to a greater or less extent into and

through the dry earth back of the abutment and back of the retaining wall and necessarily loosen the earth and contribute something to the fall of the retaining wall.    After the dam was built under the bridge the sand and silt accumulated somewhat back of the same and filled in and around and against the footings of the abutment.    The defendant claims and there is some testimony tending to show that this dam and the natural sediment that would collect at the bottom would brace and support these two abutments, but I am inclined to the opinion and find that these abutments were not made to hold water in storage, and the raising of the body of the stream by this dam would disturb the natural flow of the water under the bridge and cause it to set back upon and rise up against these abutments in such a manner as to cause additional strain upon them over what the strain would be in the natural flow of the river.    In addition to this I find that the fall of the water over the dam upon the unprotected bed of the stream below has washed out the natural bed of the stream, making a considerable hole at the foot of the dam near the west abutment of the bridge and near the foundation of the wing wall which went out, and I therefore find that this dam adds somewhat to the risk of maintaining the highway bridge at this point.    If the abutments and wing walls had been put down to a solid foundation or had been laid in cement it would have made an appreciable difference and would, perhaps, have minimized the liability of injury from the effect of the dam, but even then I am unable to escape the conviction that the use of the abutment as a wing to the dam and the change of the natural flow of the water and its collection above the bridge and the weight of the water upon the abutments would have added somewhat to the burden resting upon the abutments, but in that case the risk would probably have been very small.''

The grounds on which the defendant claimed and claims a right to construct a dam at the bridge will now be considered. We here quote from the master's report as follows:  ''About thirty rods below the bridge was the head or upper end of an island in the stream which extended down stream about thirty rods.    The main channel of the river was on the west side of the island.    Opposite the lower end of the island on the western shore of the stream is the site of an old forge property and across the main channel at that point from the island to the western

shore there was a dam used in connection with the forge sixty-four rods down stream from the Lower Notch Bridge. Just when this forge was built I think the evidence does not disclose but it was operated for a good many years down to about 1862 or 1863 when it was abandoned and left to decay. The east bank of the stream from the bridge or highway to the site of the old forge is owned by the defendant's wife and occupied by the defendant and wife as a homestead. The defendant claims the right to raise the water under the bridge and flow the west bank by virtue of a deed, in his chain of title, from William S. Aborns to Winter H. Holley, executed the 15th day of December, 1847.''

The scope of the deed which the master above refers to appears from the second part of the description which is this: ''Meaning hereby to convey the whole of my interest in the forge, coal houses, ore houses, flume and dam standing on said land together with all the interest I have in the tools and implements belonging to said forge with the privilege of building any dam, or headgate, where the upper dam now stands, and may raise all the pond above said upper dam which is necessary for the forge and may have the privilege of erecting any cross dam above the upper pond which may be necessary for the forge below.''

Of the property conveyed by Aborns to Holley in 1847, Mrs. Cornelia Smith, the widow of one of the two surviving children of Holley, gave the defendant a quit-claim deed on December 1, 1890. Notwithstanding the mention of an upper dam in the deed from Aborns to Holley the master is unable to find that there was a dam across the river further up stream than the old forge dam until one was built by the defendant; though we understand one of the master's findings to be, in substance, that there was at some time a short breakwater from the upper end of the island to the east bank of the stream, the purpose of which was to turn all the water of the stream into the main channel west of the island.

It was conceded before the master that the water impounded by the old forge dam never set the water of the stream back as far as the bridge. At the time when the widow of one of Holley's children gave her quit-claim deed to the defendant the old forge property had been abandoned for some twenty-seven or twenty-eight years. Counsel differ as to whether, in any view of the facts, the right to dam the stream at or near the old forge dam

passed to the defendant.  It is claimed on the part of the defendant that the reference to the forge water privilege in the deed from Aborns to Holley measured the extent of a right which passed to the grantee and which continued to exist after the forge was abandoned, and which passed to the defendant when he took his deed from Mrs. Smith.  It is claimed by the orator that, in respect to a water privilege, whatever right Holley had ceased to exist when the forge was abandoned.  But the question of who is right in this regard is not material in this case.  If it is to be assumed that the defendant is right, and that Mrs. Smith's quit-claim deed gave the defendant all the right that Holley ever had, the most the defendant can claim in the way of a right to dam the river in this vicinity is a right to build a dam somewhere down stream from the bridge and to maintain such dam at such height as would afford a water privilege at the site of the old forge equal to that once used or needed in connection with the old forge property; and it sufficiently appears that such a dam would not set the water back so as to interfere with the natural flow of the water under the bridge and that, therefore, it would be no concern of the town of Bristol.

It fully appears that the dam maintained by the defendant under the bridge is unlawfully maintained and is an encroachment upon and an injury to a public highway which the town of Bristol is in duty bound to protect and maintain.

In view of the findings of the master the conclusions thus far reached were not much contended against in argument in this Court.  But it was urged by the defendant that if such conclusions should be reached the circumstances of the case are such that an application should be made of the doctrine of comparative equities.  This claim calls for the mention of some further facts.

In 1888, the defendant built a dam across the river about twenty-eight rods below the bridge.  He claimed to do this under an agreement of purchase with Mrs. Smith of what she afterwards conveyed to him by her quit-claim deed of 1890 before referred to.  The top of this dam, however, was a few inches lower than the natural level of the water under the bridge.  Opposite this dam, on the east side of the river and on land belonging to his wife, the defendant built an ice house.  He entered upon the ice business securing his ice from the pond formed by this dam

and from other places where accumulations of ice were to be found. With these facilities the business was carried on by the defendant to some extent but at a disadvantage. In 1898-9, the defendant got out timber for the dam under the bridge which he commenced to build in 1900, and practically completed in 1903. As we have seen, it was then that the selectmen first knew of the building of the dam, the work until then having been under water. On the land of his wife the defendant built a reservoir to which water for the purpose of making ice was brought from a bulkhead at the dam. The defendant also built another ice house and put in machinery for cutting, storing and hauling ice for the market. This business he has since carried on.

The master reports that after the hearing before him was begun, sometime in December, 1907, another freshet carried out a wing wall of one of the abutments of the bridge. The case standing as it did, no evidence was introduced as to the specific causes of this washout. In connection with other things the fact is recited that in 1897, the west abutment of the bridge was carried out by a freshet. In reciting early events, events that occurred prior to the laying out of the highway, the master says: "It is probable that prior to 1830, the highway ran along the westerly shore of this river from near the point of location of the present bridge northerly and across the stream somewhat farther up, and that about this time in a severe freshet the highway was destroyed and a stringer bridge was built at the site of the present bridge." This probable washout and the washouts of 1897 and 1907, are referred to at this point simply for the bearing they have upon the question of the protection which this bridge requires.

The master finds that the removal of the dam under the bridge would injure the defendant about three thousand dollars. He further finds that the damage to the town by reason of the washout of 1906, which led to the bringing of this bill, is two hundred and twenty-five dollars and that, to quote, "the injury to the bridge by reason of the maintenance of the dam would not exceed twenty-five dollars a year, and that the damage to the defendant if the dam were to be removed would be relatively greater and disproportionate to the damage to the town if the dam were maintained."

That there are cases proper for the application of the doctrine of comparative equities has been recognized by this Court. In *Curtis* v. *Winslow,* 38 Vt. 690, it was held that one who had bought land of another with notice of the grantor's intention to build a barn near by, on adjoining land, could not equitably complain because the grantor built and maintained a barn accordingly. In this case the doctrine of comparative equities is somewhat considered.

In *Ottaquechee Woolen Co.* v. *Newton,* 57 Vt. 451, the Court refused an injunction against defendants who were proceeding under a franchise granted by the State and neither lost nor adjudged forfeited. The Court say that to grant the injunction prayed for would be indirectly to decree a forfeiture of a franchise, and that such a thing a court of chancery will not do. Other reasons for withholding the injunction are pointed out, and the matter of comparative equities is discussed. What is said on that subject is reviewed in *Royce* v. *Carpenter,* 80 Vt. 37, 66 Atl. 888, where, after consideration, the doctrine of comparative equities is held to have no application in that case.

It is clear from the report that the continuance of the dam in question here must occasion a continuous series of injuries to the highway bridge, that the doctrine that the law does not care for trifles does not apply, that the orator is without adequate remedy at law, and that an injunction should issue, unless the doctrine of comparative equities invoked by the defendant ought to be applied.

Considerable hesitation in respect to the process of injunction is shown when it is sought to forbid a person the use of his own property, in the prosecution of a lawful industry in a careful manner, on the ground that such use is nevertheless a nuisance to another. So much noise and smoke and grime necessarily attend the prosecution of many important industries that not only must the question of what in such circumstances constitutes a nuisance be determined with caution, but also with like care must be determined the question of what remedy shall be afforded for an incidental injury.

In *Earl of Ripon* v. *Hobart,* 1 Cooper's Sel. Cas. 333, Chancellor Brougham well speaks of ''the great fitness of pausing much before we interrupt men in those modes of enjoying or

improving their property which are *prima facie* harmless or even praiseworthy.''

*Richard's Appeal,* 57 Pa. St. 105, 98 Am. Dec. 202, is illustrative.

But the present case has been stated with sufficient fulness to make it apparent that many considerations which might arise in cases of the class just referred to have little or no force here. Our inquiry runs only to the case of an invasion of one of those public rights which is most jealously to be guarded, and we have to consider the manner of its invasion. The highway and the bridge were at all times notice to the defendant of the public easement which has been established in this case. *Wright* v. *City of Doniphan,* 169 Mo. 601, 70 S. W. 146. When in 1888, the defendant erected a dam he built it so far down stream that the natural flow of the water under the bridge was not obstructed. When from 1900 to 1903, he began and carried forward the erection of the dam under the bridge he asserted a claim which as he was bound to know directly antagonized an obvious claim in favor of the public.

Until 1903, the selectmen of the town knew nothing of the work on the dam which until then was under water. The defendant advanced the claim, found to be ill-grounded, that the dam would strengthen the bridge. The selectmen denied his right to maintain the bridge and undertook to give him no license or permission to do so, and the defendant acted at his peril until the disaster to the bridge in 1906 precipitated the issue before us.

*Attorney General* v. *Algonquin Club,* 153 Mass. 447, 27 N. E. 2, 11 L. R. A. 500, had to do with projections from a building along Commonwealth Avenue in Boston. The defendant vigorously claimed that it had a right to maintain the projections in question and the construction of a certain deed was involved. In this contention the defendant failed. With regard to a further contention, on the part of the defendant, the court say: ''The defendant further contends that the projections are not of sufficient importance to warrant a mandatory injunction or order for their removal. This argument would be of more weight in a case where a defendant had erected a building with unauthorized projections, in ignorance that they were deemed to be unauthorized, and where he was not aware that his right to

do so was disputed. Without considering what should be done in such a case, it is enough to say that such is not the case here. If the defendant, after deliberately proceeding, in the face of the remonstrances of the officers of the commonwealth, to erect projections which are now determined to be unwarranted, can yet be heard to urge that after all no order for their removal should be passed, it would gain something not much short of a right by stoutly asserting an invalid claim. The space was reserved for reasons affecting not only neighboring owners, but the public at large. Compensation to the commonwealth for such an intrusion into the reserved space would be an unsuitable remedy. * * * We cannot say, under the circumstances as they appear, that the injury is trifling or unsubstantial. If one such intrusion into the reserved space is allowed to pass, others must be.''

*Town of Burlington* v. *Schwarzman,* 52 Conn. 181, 52 Am. Rep. 571, was a bill brought by a town to enjoin the maintenance of an obstruction in a highway. The defendant's first contention was that as highways are public easements merely which a town as such does not own, the town in question had not sufficient interest to enable it to maintain the suit. No like contention is made here and so we pass over the discussion of this matter by the Connecticut Court. Having reached the conclusion that the duties and liabilities of a town in respect to a highway are such as to make it a proper complainant in equity, the court passed to the defendant's second contention which was that no case for an injunction had been shown. In disposing of this contention adversely to the defendant the court say that were the way merely a private one wrongfully obstructed and threatened the court would probably not hesitate to enforce the remedy upon the ground of preventing a recurrent grievance and a multiplicity of suits, and that the fact that the way was a public one vastly strengthened the case.

*Reimer's Appeal,* 100 Pa. St. 183, 45 Am. Rep. 373, was a proceeding by the attorney general to secure the removal of a bay window projecting from the second story of the building line of a street. The projection had been made substantially in accordance with permission which the city council of Philadelphia acting in excess of its powers had undertaken to give. The defendants objected to the relief sought for the reason that the removal of the window would subject them to great expense and

in no way benefit the public.    The court held that no question of
the amount of damages was to be considered; that the question
was simply one of the invasion of a public right.    They held that
the doctrine *de minimis* was not applicable, because a common
right was invaded, and that taken for a private use which
belonged to the public.    We do not say here that there ·may not
be technical invasions of a public right so trivial and inconse-
quential that the law will disregard them; nor is the Pennsylvania
court to be understood as so saying.

Our statutes provide that no right or interest within the
limits of a highway shall·be acquired by possession or occupation,
and that a public easement in a stream shall not be lost or
abridged by prescription or by adverse possession.    P. S. 4045,
4046.    Chapter 175 of the Public Statutes is wholly devoted to
provisions for the protection of highways.    Statutes, decisions,
dicta, maxims and texts, all recognize the dangers and incon-
veniences that would result from the allowance of even slight en-
croachments upon public rights, for what one may do another
may do, and without vigilant protection such rights by piece-
meal would be destroyed.    The case of the *City of Demopolis* v.
*Webb,* 87 Ala. 659, 6 So. 408, and the same case under the title
of *Webb* v. *City of Demopolis,* 95 Ala. 116, 13 So. 289, 21 L. R. A.
62, is here referred to because of the views of public policy which
are therein set forth and of the manner in which they are forti-
fied by the authorities cited.

This case is not one for the application of the doctrine of
comparative equities, and on the master's report the injunction
in the present case was properly granted.

The defendant in his brief asks that if the Court reaches the
above conclusion such a course be taken that the cause may be
recommitted to the master for a finding ''as to the cost of con-
structing such a bridge as will fairly protect the orator and the
public from the operation of the defendant's dam.''    But the
views already expressed herein· do not permit such a course to
be taken.    It would be contrary to public policy to put the de-
fendant on any such footing as such a course would seem to afford
him.

The decree of the court of chancery, which need not be
recited in full, commanded and enjoined the defendant, within
forty days of the date thereof, to remove the dam, and also en-

joined him from building any dam that would set back the water of the river to the damage of the bridge or its supports, and further commanded the defendant to pay to the orator as damages occasioned by the dam the sum of two hundred and twenty-five dollars, with costs of suit. The amount of damages is that reported by the master as resulting from the washout in 1906.

*Decree affirmed and cause remanded. Let a new time for removing the obstruction be fixed below.*