JOHN HUEBSCHMANN ET AL. *v.* GRAND COMPANY.

[No. 50, January Term, 1934.]

616

*Decided April 6th, 1934.*

The cause was argued before BOND, C. J., URNER, AD-KINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William Purnell Hall,* with whom was *Elmer H. Miller* on the brief, for appellants.

*J. Calvin Carney,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Eastern Avenue in Baltimore City runs east and west, intersecting Dean Street, running north and south. West of Dean Street and parallel to it is South Conkling Street. John and Annie Huebschmann, the appellants, own three adjacent lots lying on the south side of Eastern Avenue, numbered 3701, 3703 and 3705, of which No. 3701, lying at the intersection of Eastern Avenue and Dean Street, binds on the east side of that street for about one hundred and thirty-five feet to a point where it intersects Yankee Street, running east from Dean Street.

The Grand Company, the appellee, owns adjacent lots numbered 509 to 517 South Conkling Street, which extend

easterly to the west side of Dean Street, and opposite the west side of the Huebschmann lot No. 3701 Eastern Avenue.

Dean Street between Eastern Avenue and Yankee Street, indifferently referred to as a street and as an alley, is used as a way of ingress and egress to and from the rear of properties fronting on South Conkling Street, the west side of No. 3701 Eastern Avenue, and other properties abutting thereon, and for the accommodation and convenience of the general public. It is unpaved, but for seventy feet south of Eastern Avenue there is on either side of it a brick sidewalk. No. 3701 Eastern Avenue is improved by a store and dwelling now in a dilapidated run down condition, and in the rear by three corrugated iron sheds used and rented for the storage of automobiles. When the Grand Company acquired the South Conkling Street property it was improved by an "old mortar built house and wooden structure," which by certain alterations it converted into a motion picture theater. In connection with that improvement, in June, 1929, it applied to the board of estimates of Baltimore City for permission to extend its building into the bed of Dean Street by erecting thereon, adjacent to the eastern line of its property binding on that street, a brick structure twenty-four feet wide, twenty-two feet high, and extending approximately five feet into the bed of Dean Street. Notice of the application was received by Huebschmann, who protested against the improvement, first to the attorney in whose name the notice was sent, then at the building engineer's office, where he was told that there was "nothing here to protest against." Notwithstanding his protest, the board of estimates approved the application, on July 1st, 1929, a permit for the construction of the extension was issued by the buildings engineer, and it was erected.

On March 14th, 1931, John and Annie Huebschmann filed the bill of complaint in this case against the Grand Company to compel it to remove the encroachment, on the apparent theory that it was not only an unlawful nuisance, but that it inflicted a special injury on them in so narrowing Dean

Street as to deprive them of reasonable and convenient access to their property abutting on that street opposite the extension. To that bill the defendant filed a combined answer and demurrer. In its answer it averred that the extension was erected pursuant to valid authority, denied that it interfered with the reasonable use of plaintiffs' property, and invoked the doctrine of comparative injury and benefit. The demurrer was not considered, but upon those issues the case was heard, evidence taken, and on September 14th, 1933, the bill of complaint was dismissed. This appeal is from that decree.

In addition to what has been stated, the evidence sufficiently established that, while it would cost perhaps as much as $20,000 to secure the benefits and advantages resulting to appellee from the construction of the extension, it cost only $1,500 to erect it, and it can be taken down and the original wall bricked up at an expense of $500. It also appeared that the extension did substantially interfere with the reasonably convenient use of the plaintiffs' garages, and made them less useful for the storage of automobiles and more difficult to rent.

In the course of the examination of Henry L. Maas, the builder who constructed the extension, as reflecting upon the plaintiffs' acquiescence in the improvement, he gave this testimony: "Q. While you were putting it up did you see Mr. Huebschmann here? A. I think he seen me several times down there. He seen me while we were down there doing the other work in the Grand Theatre. Q. Did you use part of his yard? A. Yes, we had a small concrete mixer in his yard. I asked him for permission to put it in there. Q. After you got through did he complain about his door being broken and you fixed it? A. Yes, we fixed all his gates up. Q. How long were you around there putting this projection up? A. This projection—just the projection alone? Q. Yes. A. And cutting the wall to it? Q. Yes. A. Took us about two weeks. Q. Did you see Mr. Huebschmann at that time? Did you see him during that time? A.

I cannot tell you whether I seen him on each particular time, but I think I did."

It also was shown that, while Huebschmann attempted to protest to the building engineer, he made no protest to the board of estimates.

The real line of cleavage between the contentions of the respective parties to the appeal is whether the right to construct the extension in the bed of a public way was a franchise governed by the provisions of sections numbered 7, 8 and 37 of the Baltimore City Charter (Code Pub. Loc. Laws 1930, art. 4), or a minor privilege within the provisions of section 37 of that charter. Since both sides concede their validity, it will for that reason be assumed that these several statutory provisions are valid constitutional enactments, and that we are concerned only with their construction. So far as this case is concerned the important distinction between a "minor privilege" and a "franchise" is that a "minor privilege" may be granted by the board of estimates, while a "franchise" must be granted by an ordinance of the Mayor and City Council of Baltimore.

The learned and careful chancellor who decided the case below was of the opinion that it was not material to decide that question, because "the evidence shows that saleable and rental value of the frame sheds is negligible; that to remove the above named extension and make the changes and repairs then necessary to allow the defendant to use its building as a moving picture theatre, not only would cost about $20,000, but would seriously impair its value as such, and that any benefit resulting to the plaintiffs from such removal would be negligible." We are unable to accept that view of the law. If the right to construct the extension in the bed of a public highway was a franchise, the board of estimates was powerless to grant it, and the obstruction was erected without authority of any kind and constituted a nuisance. And the fact that the appellee, which created the nuisance in the first place, will gain more by its continuance than the appellants will by its abatement is no reason why it should be con-

tinued, if it substantially interferes with the appellants in the reasonable use of their property; for the right of the citizen to possess and enjoy property depends, not upon its value as compared with other property, but upon constitutional guaranties.

There are cases in which the principle of balancing conveniences and inconveniences is properly recognized, but they are cases in which some element of estoppel enters and where the question is affected by a public interest. In those cases, where the inconvenience or loss resulting to the complainant from the continuance of the nuisance is slight as compared with the inconvenience to the public or the loss to the defendant resulting from its abatement, equity will refuse relief. But we know of no respectable authority for the principle that one may for his own private gain appropriate his neighbor's property to improve his own because his neighbor's loss will be less than his gain. 20 *R. C. L.* 480; 46 *C. J.* 775; *Sullivan v. Jones & Laughlin Steel* Co., 208 Pa. 540, 57 A. 1065; *Town of Bristol v. Palmer,* 83 Vt. 54, 74 A. 332; *L. R. A.* 1916C, 1269; *Brede v. Minnesota Crushed Stone Co.,* 143 Minn. 374, 173 N. W. 805. For, as was said in *Sullivan v. Steel Co.,* 208 Pa. 540, 57 A. 1065, 1071: "There can be no balancing of conveniences when such balancing involves the preservation of an established right, though possessed by a peasant only to a cottage as his home, and which will be extinguished if relief is not granted against one who would destroy it in artificially using his own land. Though it is said a chancellor will consider whether he would not do a greater injury by enjoining than would result from refusing and leaving the party to his redress at the hands of a court and jury, and if, in conscience, the former should appear, he will refuse to enjoin (*Richards' Appeal* [57 Pa. 105], *supra*); that 'it often becomes a grave question whether so great an injury would not be done to the community by enjoining the business, that the complaining party should be left to his remedy at law' (*Dilworth's Appeal* [91 Pa. 247], *supra*); and similar expressions are to be found in other

cases; 'none of them, nor all of them, can be authority for the proposition that equity, a case for its cognizance being otherwise made out, will refuse to protect a man in the possession and enjoyment of his property because that right is less valuable to him than the power to destroy it may be to his neighbor or to the public.' "

Coming then to the question as to whether the permit granted to the appellee was a minor privilege within the meaning of section 37, Baltimore City Code (Code Pub. Loc. Laws 1930, art. 4), or a franchise within the meaning of sections 7 and 8 (*Ibid.*), it may be repeated that we are not dealing with a question of power or of the right of the municipality to adopt those ordinances, for that was conceded by the parties, and we express no opinion as to it, but we are dealing solely with the meaning to be given the terms "franchise" and "minor privilege".

"Minor privilege" is a colloquialism ordinarily used to describe a license or a privilege granted mediately or immediately by the state, less extensive in its duration and incidents than a franchise.

"Franchise" is a word which has come to be used to describe a grant by a state to some person, natural or corporate, of some privilege or power, not common to the people generally, in respect to property or rights subject to the control of the state or of some agency of the state. *McQuillen on Mun. Corp.* 1739 *et seq.*; *Bouvier Law Dict.*; *Words and Phrases,* Second, Third and Fourth Series; 26 *C. J.* 1008 *et seq.*

But the terms "privilege" and "franchise," when used in connection with such a grant, merge and dissolve, and are so differently applied that it is impossible to define or distinguish them with any precision or accuracy, or to say in what cases a privilege may be considered as a franchise or a franchise as a privilege. So that, in interpreting the statute in this case, little help is to be had from any generally accepted definition of the terms, but we are remitted to the illustrations used in the statute itself for aid in defining and limiting the meaning of the terms.

Section 7, Baltimore City Charter, (Ed. 1927), provides: "The title of the Mayor and City Council of Baltimore, in and to its water front, wharf property, land under water, public landings, wharves and docks, highways, avenues, streets, lanes, alleys and parks, is hereby declared to be inalienable."

Section 8, *Ibid.*, provides in part: "The Mayor and City Council of Baltimore may grant for a limited time and subject to the limitations and conditions contained in this Charter, specific franchises or rights in or relating to any of the public property or places mentioned in the preceding section; provided that such grant is in compliance with the requirements of this Charter, and that the terms and conditions of the grant shall have first been authorized and set forth in an ordinance duly passed by the city."

Section 37, *Ibid.*, after providing that, "Before any grant shall be made by the Mayor and City Council of Baltimore, of the franchise or right to use any street, avenue, alley or highway, or the grant of the franchise or right for the use of any public property mentioned in Section 7 of this Charter, the proposed specific grant, with the exceptions hereafter in this Section made, shall be embodied in the form of an ordinance, with all the terms and conditions required by the provisions of this Charter, and such others as may be right and proper, including a provision as to the rates, fares and charges, if the grant provides for the charging of rates, fares and charges, and a provision that the franchise or right shall be executed and enjoyed six months after the grant," further provides "that the right to use the streets, avenues, alleys or public property, by any person or body corporate for steps, porticoes, bay windows, bow windows, show windows, signs, columns, piers or other projections or structural ornaments of any character except so far as the same may be prohibited by law, and covered vaults, covered arcaways, drains, drainpipes, or any other private purpose not prohibited by laws and not being a franchise or right requiring a formal grant by ordinance under the terms of this section, may be granted

by the Board of Estimates for such an amount of money and upon such terms as the said Board may consider right and proper."

These several statutes may be construed together as *in pari materia,* and so construed, it is apparent that the intent of the Legislature was to limit the meaning of the word "franchise" to grants of privileges in public highways in furtherance of the public convenience or welfare, and to exclude from it the grant of rights in such highways less extensive and of a private nature. To make that meaning clear and intelligible it enumerated different privileges which should not be considered as franchises, such as the right to use such highways for "steps, porticoes, bay windows, bow windows, show windows, signs, columns, piers or other projections or structural ornaments of any character except so far as the same may be prohibited by law, and covered vaults, covered areaways, drains, drain-pipes, or any other private purpose."

So construed, the conclusion seems inevitable that the right to make the extension authorized in this case must be classified as a "minor privilege" rather than as a "franchise," for if it can be allowed at all it must come within the term "other projections", used in section 37. When, in section 37, reference is made to granting a "franchise," it is provided that the ordinance embodying the grant shall include a provision as to the rates, fares, and charges. Such a provision would in a grant to a public utility company of the right to use the streets in furtherance of its service be natural and appropriate, but it would have no necessary place in a grant merely conferring upon a private person the right to encroach upon a public way for the improvement of his property. So when the statute comes to deal with the granting of such rights, it treats them as of less importance and different from "franchises," which must be granted by an ordinance, but permits them to be granted by the board of estimates without any conditions or stipulations as to rates, fares, and charges, but upon terms and a price to be fixed by that agency. Moreover, in section 8, which deals exclusively with franchises

which must be granted by ordinance, it is provided that the city "shall at all times have and retain the power and right to reasonably regulate in the public interest the exercise of the franchise or right so granted. * * *" Such a provision could have no relation to the right to obstruct a public way by a brick extension to a building abutting thereon, for the exercise of such a right would not be the subject of regulation to any greater or less degree than the right to erect similar structures on private property, nor would the public have any interest in it other than that of having it so constructed and used as not to menace the public welfare or safety.

If, therefore, the right to erect such a structure in a public way may lawfully be granted at all by the State, we have no doubt that under the statutes cited the power to grant it is lodged in the board of estimates, and that it is to be classified as a "minor privilege", and not as a "franchise" within the meaning given the word in those statutes.

But while that conclusion may remove the structure from the category of a purpresture or a public nuisance (*Bouvier, Law Dict.* 2379, 2773; *Wood on Nuisances,* sec. 753 *et seq.;* 20 *R. C. L.* 499; *O'Brien v. Balto. Belt. R. Co.,* 74 Md. 375, 22 A. 141), accordingly as it was or was not within the power of the State to legalize such a use of the street, it by no means follows that the appellants are without remedy if in fact the maintenance of the structure inflicts upon them special damages different in kind from those suffered by the general public. *Van Witsen v. Gutman,* 79 Md. 405, 29 A. 608, 609; *O'Brien v. Balto. Bell R. Co., supra; Townsend, Grace & Co. v. Epstein,* 93 Md. 554, 49 A. 629, 632; *Baltimore & P. R. Co. v. Fifth Baptist Church,* 108 U. S. 317, 2 S. Ct. 719, 27 L. Ed. 739; *Blanc v. Murray,* 36 La. Ann. 162; *Louisville & N. Terminal Co. v. Lellyett,* 114 Tenn. 368, 85 S. W. 881; 46 *C. J.* 673; *First Avenue Coal & L. Co. v. Johnson,* 171 Ala. 476, 54 So. 598; *Johnson v. Oakland,* 148 Md. 434, 129 A. 648; *Block v. Baltimore,* 149 Md. 55, 129 A. 887. For while the Legislature in the interest of

the public welfare may legalize what would otherwise be a nuisance, it may not in the exercise of that power "take" private property for a public use without just compensation (*O'Brien v. Balto. Belt R. Co., supra,* and citations *supra*) and *a forliori* it cannot appropriate or substantially damage private property owned by one person for the solely private benefit and gain of another. *Ibid.* In such cases as *Northern Cent. R. v. Oldenburg & Kelley,* 122 Md. 248, 89 A. 601, and *Garrett v. Lake Roland Elevated Ry. Co.,* 79 Md. 277, 29 A. 830, 832, the court invoked and adopted the principle that the damages occasioned to abutting owners by the mere occupation of a public highway, such as changing the grade thereof or laying a railway thereon, not amounting to a "taking," are merely consequential, if such use and occupation is in pursuance of legislative authority. But in explanation of that doctrine it was said in *Garrett v. Lake Roland Ry. Co., supra*: "But the immunity which protects from liability governmental agencies, in the proper and skillful performance of their public functions, does not extend to private persons or mere *quasi* public corporations; and therefore, while in both instances the same distinction between an actual taking of private property and consequential injuries to it when not taken is applicable, a private person or a *quasi* public corporation is liable in damages to the individual incidentally injured, though the act complained of, and occasioning the injury, was in itself lawful. Hence, for such injuries as are complained of here, though they do not amount to a taking of property, if found to exist, there is a remedy in a court of law. *R. R. Co. v. Reaney,* 42 Md. 117." Consistently with that principle, it has also been held that the obstruction of a public highway for a wholly private purpose cannot be legalized. And in *Townsend, Grace & Co. v. Epstein, supra,* it was said: "The corporation, the Mayor and City Council of Baltimore, is invested with the title to and control over the public streets. This control, however, is not an arbitrary control. The streets and highways are held in trust for the benefit, use, and convenience of the general

public. There are many ways in which the power to control and regulate the use of the streets can be and must be exerted by the municipality to meet the necessities and the convenience of an urban population, but the exertion of this power must have for its object a public purpose. It is not in accord with the trust upon which the municipality holds the streets, nor with the nature of the control which it has over them, to make use of the power and authority with which it is invested in that regard to promote a mere private purpose, to subserve a mere private interest, or to subordinate the right of one citizen in the streets or in a street of the city to the private interest and convenience of any other." In *Van Wilsen v. Gutman, supra,* the principle was thus stated: "It is recognized by the statute that abutting owners have interests in the street or alley which are valuable, and that these cannot be taken for the public use without compensation. It is believed that no one will contend that they can be taken for private use on any terms whatsoever. Certainly such a doctrine has never at any time found any toleration in this case. The Supreme Court of the United States in *Wilkinson v. Leland,* 2 Pet. 657 (7 L. Ed. 542), said: 'We know of no case in which a legislative act to transfer the property of A. to B. without his consent has ever been held a constitutional exercise of legislative power, in any state of the Union.' Another high authority has said that such a transaction would be robbery, and not legislation."

In this case the validity of the ordinances is not questioned, but it is denied that they authorized the grant to the appellee. Much the same question was before the court in *Townsend, Grace & Co. v. Epstein, supra,* where, under the supposed authority of an ordinance of the Mayor and City Council of Baltimore, permission was granted Epstein to erect a bridge seventeen feet above the surface of Garrett Street. The court there distinguished such a use from that under consideration in *Garrett v. Janes,* 65 Md. 260, 3 A. 597, on the ground that the use granted to Epstein was pri-

vate, while that granted to Garrett, permitting the adornment and architectural embellishment of dwellings, was in the interest of the general welfare. But conceding that there is little distinction to be made between a nine-foot extension in front of a building and a five-foot extension in the rear thereof, except that the one is called a bay window, and the other merely an extension, it is scarcely open to doubt that the privilege granted appellee, to obstruct the alley by a brick structure twenty-four feet long, twenty-two feet high, and five feet deep, was entirely for its private benefit and wholly unaffected by any public interest whatever. It tended neither to the improvement of the appearance of the neighborhood nor the convenient use of the street, nor did it tend to enlarge the sphere within which private taste might be applied to the adornment of the abutting properties. Its only purpose and effect was to allow appellee to enlarge the accommodations of its theatre more cheaply.

But no authority, state or otherwise, could be invoked to gratify such a purpose without liability to one specially injured by its execution. The highways, streets and alleys of the city are held and controlled by it as avenues of communication for the whole public, and not to be hired or rented to private persons for revenue. In this case the appellants, as members of the general public, were entitled to the use of the street from end to end and from side to side (*Elliott on Roads and Streets,* sec. 828), and as abutters they had a private interest in it as a means of access to their property distinct from that of the general public (*Ibid.,* sec. 488), of which they could not be deprived without just compensation. *Van Witsen v. Gutman, supra,* 79 Md. 409, 29 A. 608; *De Lauder v. Baltimore County,* 94 Md. 1, 50 A. 427. And while, unless affected by some injury different in kind from that suffered by the general public, they would be without standing to abate a public nuisance, whether legalized or not, yet where they are specially damaged by an unauthorized obstruction of the way they are entitled to have it abated (*Van Witsen v. Gutman,* 79 Md. 405, 29 A. 608; *Townsend, Grace & Co. v.*

*Epstein, supra*), or to recover damages against the tort feasor. *Ibid.* In the case of a legalized nuisance (so called), whether entitled on the facts to its abatement or not, they are entitled to damages caused to them by the obstruction which are different in kind from those suffered by the public generally. *Northern Central R. Co. v. Oldenburg & Kelley, supra.*

In this case the grant to the appellee, a private person, for its own peculiar and private benefit, was beyond the power of the board of estimates, and conferred no valid authority upon the appellee to erect the obstruction of which the appellants complain, and they are, unless estopped by their own conduct, entitled to have it abated.

The facts relied upon as creating an estoppel are that the appellants, after having been notified of the application to construct the extension, protested to the attorney for the applicant and to the building engineer, but filed no protest with the board of estimates which alone was authorized to grant the permit; that after the permit was issued they stood by, and not only permitted the appellee to expend substantial sums of money on the improvement without further protest or objection, but even allowed the contractor in charge of the construction work to store on their premises a concrete mixer used in connection with the work.

Whether the doctrine of estoppel can be invoked against one who seeks to abate an unauthorized obstruction of a public way is a question upon which there is wide diversity of judicial opinion (*Elliott on Roads and Streets,* sec. 1189; 46 *C. J.* 776; *McQuillen on Mun. Corp.,* sec. 1435, 1437, *et seq.*), and while the right to invoke it in such cases has been recognized in this state (*Woodyear v. Schaefer,* 57 Md. 1; *Baldwin v. Trimble,* 85 Md. 396, 37 A. 176, 178; *Townsend, Grace & Co. v. Epstein, supra*), it has been restricted within very narrow confines. *Ibid.* In *Baldwin v. Trimble, supra,* where it was applied in connection with a possible claim by the municipality to an abandoned highway upon which buildings had been erected, it was said: "While an encroachment on a highway is conclusively settled in Maryland to be a

public nuisance, which can never grow by prescription into a private right (*Phila., W. & B. R. Co. v. State,* 20 Md. 157; *North. Cent. Ry. Co. v. Baltimore,* 21 Md. 93; *Ulman v. Charles Street Avenue Co.,* 83 Md. 130, 34 A. 366), yet it may be true, and in perfect harmony and accord with that doctrine, that cases concerning public streets can arise of such a character, and be founded upon such an actual and notorious abandonment of the highway by the public, that justice requires that an equitable estoppel shall be asserted even against the public in favor of individuals." In *Townsend, Grace & Co. v. Epstein, supra,* where the plaintiff stood by and saw expensive improvements erected without protest, the court refused to apply it, nor was it applied in *Woodyear v. Schaefer,* a pollution case. It is well settled that one cannot acquire a prescriptive right to obstruct a public highway, and, as pointed out in *Baldwin v. Trimble, supra,* while the doctrine may properly be invoked in respect to an abandoned highway, it has no application to a case where a public highway is openly used as such, as in *Phila., W. & B. R. Co. v. State,* 20 Md. 157; *Northern Cent. Ry. Co. v. Baltimore,* 21 Md. 93; *Ulman v. Charles Street Avenue Co.,* 83 Md. 130, 34 A. 366, because in such cases the nuisance can never ripen into a right through prescription. In this case not only is that true, but by the very terms of the application the right to maintain the structure is revocable at any time at the "pleasure" of the board of estimates.

It is established that the appellants did protest against the encroachment even before the permit was issued, so that the only possible grounds upon which an estoppel could rest are that they delayed bringing this suit for nearly two years, that they permitted the builder to repair a door, which he had broken, and that they permitted him to store a concrete mixer in their yard. But since the encroachment was an original and continuing nuisance, which neither under the terms of appellee's contract with the city nor the rules of the common law could ever ripen unto a fixed irrevocable right, these grounds, considered separately or together, furnish no

basis for an estoppel. *Elliott on Roads and Streets,* sec. 1189; *McQuillin on Mun. Corp.,* secs. 1439, 1435, note 30; 46 *C. J.* 777; *Baldwin v. Trimble, supra.* It is said in *Elliott on Roads and Streets,* sec. 1189: "It is difficult to conceive upon what principle an equitable estoppel can be securely placed in such cases, for the person who encroaches upon a public way must know, as a matter of law, that the way belongs to the public, and that the local authorities can neither directly nor indirectly alien the way, and that they can not divert it to a private use. As the person who uses the highway must possess this knowledge, and in legal contemplation does possess it, one of the chief elements of an estoppel is absent. An estoppel can not exist where the knowledge of both parties is equal and nothing is done by the one to mislead the other. In addition to this consideration may be noted another influential one already suggested in a different connection, and that is, the private use of the public way was wrong in the beginning and wrong each day of its continuance, and it is a strange perversion of principle to declare that one who bases his claim on an original and continued wrong may successfully appeal to equity to sanction and establish such a claim." And while that statement of the law has not to its full extent been accepted in this state, nevertheless the doctrine of estoppel has never been applied here to unauthorized continuing nuisances in the absence of extraordinary and compelling equities, which are not found in the facts of this case.

Finally, appellee contends that equity has no jurisdiction to grant the relief prayed because upon the facts appellants have an adequate remedy at law. But, for the reason assigned in *Townsend, Grace & Co. v. Epstein, supra,* page 557 of 93 Md., 49 A. 629, 633, we cannot agree with that contention.

From these conclusions it follows that the decree from which this appeal was taken must be reversed and the cause remanded.

*Decree reversed, with costs, and case remanded*
*for further proceedings in conformity with*
*the views expressed in this opinion.*