## Chicago, St. Louis & New Orleans R. Co. et al. v. Adkins et. al. and four other cases.

(Decided Dec. 16, 1932)

ROBBINS & SMITH, D. H. HUGHES, and TRABUE, DOOLAN, HELM & HELM for appellants.

GARDNER & McDONALD for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Mrs. A. M. Adkins and her children, and Henry Rohrer, Martha Mason, Mrs. J. R. James, and Luther James sued the Chicago, St. Louis & New Orleans Rail-

road Company and the Illinois Central Railroad Company to recover damages to their lands alleged to have been caused by diversion of water. The Adkins case was tried separately and resulted in a verdict and judgment in favor of plaintiffs for $2,700. The other cases were tried together, and Henry Rohrer recovered a judgment for $1,100, Martha Mason, a judgment for $1,000, Mrs. J. R. James a judgment for $400, and Luther James a judgment for $900. The Adkins, Rohrer, Mason, and Luther James cases are before us on appeal, while the Mrs. J. R. James case is before us on motion for an appeal. All the cases involve substantially the same question, and will be considered in one opinion.

The following is a brief summary of the facts disclosed by the record: Obion creek rises in Tennessee and flows north through the southern part of Graves county until it reaches a point near the town of Pryorsburg. It then flows west through Graves county for a distance of about 4½ miles, where it enters the county of Hickman, and afterwards empties into the Mississippi river. It is a considerable stream from Pryorsburg on, and flows through a fertile valley. For the purpose of draining this valley the Obion or Bullock drainage canal or ditch was completed in the year 1916. As originally constructed the ditch was about 30 feet wide and from 8 to 10 feet deep. Since that time its width has increased to 70 or 80 feet. In the year 1924 the railroads began the construction of what is known as the "Edgewood Cutoff" through Graves county and across the Bullock ditch and the valley which it drained. At that point the rails were built on an embankment 120 feet wide at the bottom, 35 feet high, and 20 feet wide at the top, with only one opening where it crossed the drainage canal. As part of the drainage plan, and before the railroad embankment was constructed, a lateral was built which ran in a westerly direction from the Baltimore & Dublin road to a point on the east side of the railroad embankment about 900 feet north of the Bullock drainage canal. At that point the lateral turns in a southwest direction and empties into the canal about 600 feet west of the embankment. This lateral was constructed for the purpose of taking care of the waters in the old creek and flowed in the same general direction as the drainage canal into which it flowed at an angle of about 30 degrees. As part of the drainage

system, other laterals were constructed at other places, and in some instances the property owners built neighborhood ditches for the purpose of taking care of the waters. After the drainage canal and laterals were constructed, the property owners directly interested constructed a ditch from 10 to 15 feet deep and 40 feet wide, running north and south from the northwest corner of the Adkins land, and entering the lateral north of the canal on the west side from where the embankment is now located. This ditch is known as Sand ditch. In this ditch the embankment was contructed, and, when the embankment came as far south as the lateral, the lateral was cut out. To provide for the drainage area thus affected, the railroad constructed a ditch on the west side of the embankment from 25 to 30 feet wide and from 4 to 7 feet deep. This ditch runs south into the old lateral west of the railroad embankment, and enters the Bullock drainage canal at a point about 600 feet west of the embankment. At the same time the railroads constructed a ditch 40 feet wide at the top, 30 feet wide at the bottom, and from 4 to 10 feet deep, immediately adjoining the embankment on the east for the purpose of taking care of the waters on that side of the embankment. The Adkins land, consisting of about 100 acres, lies just east of the embankment. Henry Rohrer's land, consisting of 34 acres, lies east of the land of J. W. Franklin and is about 400 feet from the embankment. Mrs. J. R. James' tract of 12 acres lies immediately east of the Rohrer land. Next on the east is Martha Mason's land, consisting of 43 acres. Immediately east of the Baltimore & Dublin road is the Luther James tract, consisting of 39 acres.

The record is voluminous, and it is not practicable to give in detail the evidence of each witness. According to the evidence of plaintiffs and their witnesses, the lands, after the construction of the drainage system, were well drained and very fertile and were never subject to substantial overflow prior to the building of the embankment. Thereafter, due to the changes made by the railroad in the drainage system, and to the construction of the embankment, the ditch and laterals were caused to overflow and the water to back up on the land. During this time the rains were the usual and ordinary rains that might be expected in that vicinity. By reason of these conditions, the adjacent lands were covered with

water, sometimes became marshy and sour, and were rendered unproductive and of little value. Prior to the injury the lands were worth $75 to $100 an acre, and after the injury from $10 to $20 an acre. On the other hand, the evidence for the railroad was to the effect that the opening in the embankment was much broader than the ditch, and more than sufficient to permit the passage of water that might be expected from usual and ordinary rainfalls; that during the years 1926, 1927, and 1928, and particularly the year 1928, the rains were unusual and extraordinary, and that by reason thereof the drain and laterals were caused to overflow; that the measurements taken on the ground showed that the depth of water at the embankment was less than that on the lands further away; thus proving that the embankment did not cause the water to back up over the lands, but that the injury to the lands was due to the water thrown on the lands by the extraordinary rains and by the overflow of the ditch and laterals caused by such extraordinary rains; and further that, in the opinion of expert engineers, the drainage system adopted by the railroad was sufficient to take care of and carry off all the water that might be reasonably expected to fall and accumulate in the valley.

At the outset we are met by the contention that appellants were entitled to a peremptory instruction on the ground that the evidence of the experts showed that the opening in the embankment was sufficient to carry off the water caused by ordinary rainfalls, and that the evidence as to the high-water marks showed conclusively that the water which caused the damage was not backwater from the embankment, and that at most the evidence is equally consistent with the existence or nonexistence of negligence. While there was some evidence of overflows prior to the construction of the embankment and the changes in the drainage system, there was substantial evidence that there was no particular injury to the lands during that period, but that, after the embankment was built and the drainage system was changed, much larger quantities of water were thrown on the adjacent lands. We do not regard the evidence of the engineers that the opening in the embankment was sufficient, or the evidence as to the highwater marks, as conclusive, in view of the situation disclosed by other evidence. Doubtless the opening in the embankment

was large enough to carry off the water from light rains, but not large enough in case of overflows from heavy rains, which should have been anticipated and provided for. Necessarily where overflows occur, the water would spread out beyond the opening, and where the embankment was solid, and thus be impeded. And not only was the credibility of the witnesses who testified as to the high-water marks a question for the jury, but, if there were overflows near the embankment and subsequent overflows further away, the flow of the water in the direction of the embankment would be impeded by the water already accumulated between it and the embankment. On the whole we are constrained to the view that the question of negligence was for the jury.

It is insisted that the court erred in not permitting appellants to file an amended answer in the Adkins case. An examination of the amendment discloses that the amendment merely stated the evidence on which appellants relied, and, as the evidence pleaded was permitted to go to the jury notwithstanding the rejection of the amendment, it is clear that appellants were not prejudiced by the action of the court.

Another contention is that the court erred in not giving instruction B, which was offered by appellants, and reads as follows:

"The court instructs the jury that the defendants had the right to build their railroad embankment on their right of way and to build the embankment across the old creek as shown in the evidence, and to make new ditches on both sides of the embankment, but in doing so it was their duty to make such ditches and maintain them in such manner as not to necessarily cause any damage to any adjacent property owners, and if the jury shall believe from the evidence that the embankment and the ditches on both sides thereof were so constructed and maintained as to make adequate provision to carry off the water from the usual and ordinary rainfall, they should find for the defendants."

Omitting the instruction defining negligence, the given instructions are as follows:

"No. 1. If the jury believe from the evidence in this case that the defendants, in the construction

and maintenance of the embankment on their right-of-way at the point complained of, negligently obstructed or diverted any natural stream, watercourse or established ditch or lateral and thereby caused the water flowing therein in periods of ordinary rainfall to be cast or to flow upon or over the plaintiffs' land in larger quantities than had theretofore been cast or flowed on or over same, or shall believe that by such construction and maintenance the defendants negligently retarded the natural flow of surface waters gathering on said lands and caused them to spread over said lands in greater quantities than theretofore in periods of ordinary rainfall, and shall further believe that as the result thereof plaintiffs' said land has been injured or damaged by water standing thereon, washing the soil therefrom, washing ditches therein, or carrying and depositing sand, gravel, rubbish or debris thereon, then the law is for the plaintiffs and the jury should so find; unless they so believe they should find for the defendants.''

''No. 2. If you find for the plaintiffs under the foregoing instruction you should assess their damages at such a sum as you may believe from the evidence fairly represents the diminution if any, in the fair market value of said land caused by the diversion of the water thereon, if any, not to exceed $8,800.00, the amount claimed in the petition.''

''No. 3. If you shall believe from the evidence that the overflow or damage to plaintiffs' land, if any, was caused by extraordinary rains or floods such as were of unusual occurrence in that vicinity and could not have been anticipated by persons of ordinary experience and prudence, you will find for the defendants.''

In support of the position that instruction B should have been given, it is argued that appellants were entitled to a concrete instruction presenting their side of the case, which was not covered by the given instructions. There was no issue as to the right of appellants to build the embankment and make new ditches on both sides thereof, and, omitting this feature, the offered instruction told the jury in substance that, if the embankment and ditches were so constructed and maintained as to

make adequate provision to carry off the water from the usual and ordinary rainfalls, they should find for the defendants. Before the jury could find for plaintiffs under instruction No. 1, given by the court, they were required to believe in the existence of certain conditions, and were told that unless they so believed they should find for the defendants. Comparing this instruction with the offered instruction, it is apparent that the offered instruction was merely the converse of the given instruction, and that the phase of the case attempted to be submitted by the offered instruction was fully covered by the concluding words of the given instruction that "unless they so believed they should find for the defendants." Not only is this true, but the court gave a further instruction to the effect that, if they believed from the evidence that the overflow or damage to plaintiffs' lands was caused by extraordinary rains or floods, etc., they should find for the defendants. Instructions in substantially the same language have been approved by the court without the addition of the words "unless they so believe they should find for the defendants." Louisville, H. & St. L. R. Co. v. Roberts, 144 Ky. 820, 139 S. W. 1073; Louisville & N. R. Co. v. Bennett, 207 Ky. 776, 271 S. W. 71. We therefore conclude that the given instructions fully covered the law of the case, and that the court did not err in refusing the offered instruction.

Appellants rely on numerous errors in the admission of evidence, all of which we have carefully examined. In some instances appellants did not object and except. In other instances the evidence was admissible to show the bias or interest of the witness, or for purposes of contradiction. In still other instances the evidence though perhaps inadmissible, bore so remotely on the issues involved that its admission could not have prejudiced appellants' substantial rights.

Particular complaint is made of the fact that some of the witnesses were permitted to fix the market value of the lands before the embankment was placed there "considering the drainage tax had virtually been paid," and also to state what the land was worth "now." As the fact that the drainage tax had been paid might affect its market value and play some part in the estimates of the witnesses, we are not inclined to the view that the reference to the drainage tax was prejudicial.

But appellants insist that the worst feature of the admitted evidence was that the witnesses were permitted to fix the market value of the land "now." This is not a case where the mere presence of the embankment injured the land. In the very nature of things there was no liability unless the water was negligently diverted and injured the land, and this could not be determined until the injury took place. We have held that, where the nuisance is permanent, the injured landowner may recover in one action for all damages, past, present, and future, and, while the measure of damages has been differently stated, we have approved instructions fixing the measure of damages, as does the instruction given by the trial court, as the diminution in the market value of the land caused by the diversion of the water. Louisville, H. & St. L. R. Co. v. Roberts, supra. As this instruction confines the damages to the diminution in the market value of the land caused by the diversion of the water, it is not to be presumed that the jury included in its verdict any diminution due to the prevailing depression or other causes. As there was abundant evidence by other witnesses in answer to questions of which no complaint was made, we are not inclined to order a reversal because of the admission of the evidence complained of.

As the verdicts in the several cases are well within the limits fixed by the witnesses, it cannot be said that they are flagrantly against the evidence.

While counsel in arguing the Adkins case used some expressions that cannot be approved, we are not persuaded that they were so improper as to require a reversal of the judgment.

Judgment affirmed. Whole court sitting.