## Kentucky Electric Development Co.'s Receiver et al. v. Wells.

(Decided Nov. 9, 1934.)

204

GORDON, LAURENT & OGDEN and SQUIRE R. OGDEN and CHARLES F. MONTGOMERY for appellants.

E. C. MOORE and OLIVER POPPLEWELL for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming in part and reversing in part.

This appeal is prosecuted from a judgment of the Casey circuit court, awarding the appellee, Lincoln Wells, damages in the sum of $150, caused by overflow of his land, and a mandatory injunction ordering the appellant company to lower its concrete dam by removing 15 inches from the top thereof throughout its entire length and spillways.

By stipulation, it appears that in March, 1929, the Oscar C. Wright Company conveyed to the appellant, Kentucky Electric Development Company, hereinafter called the company, some 2¼ acres of land situated in Casey county, Ky., near Middleburg and extending across and on both sides of Green river.

At the time this property was thus acquired by the company, there was located on it an old gristmill dam, gristmill building, and granary. Soon thereafter and during the year 1929, the company tore down and removed the old milldam and buildings and moved the site of its new dam some 53 feet up the river, where, after lowering the rock bed of the river some 2 feet by blasting, it proceeded to construct thereon a new concrete dam, 70 feet in length, and abutting spillways 57 feet in length. It appears that from this lower blasted foundation the dam was erected to a height of 9 feet 7 inches, whereupon there was superimposed a top log of 8-inch thickness, making its total height from its river bed base to its top 10 feet and 3 inches.

The appellee, Lincoln Wells, is the owner of a 40-acre tract, which was conveyed him in March, 1913. It is situated on the river about one half mile above this new dam. Some 8 acres of this tract consists of bluffs or hill land, while the remaining 32 acres is of a low, marshy type, of which 4 or 5 acres, situated furthest back from the river, are especially low and wet. For

the purpose of draining and drying out this land, so as to fit it for seasonable cultivation of crops, Wells tiled it and installed a main tile from this lowest tract across the land to the river extending a distance of some 1,700 feet, which he claims effected its proper drainage and drying and prepared it for the production of good crops until after the appellant's construction of the new dam, herein complained of as causing its overflow. Wells claims that after he tiled the land in 1917, he began to cultivate the land and produced good crops on it continuously until appellant constructed the new concrete dam, higher by some 15 inches than the old mill-site dam which he alleged had been maintained a hundred years at the aforesaid lower point in the river in connection with or appurtenant to the old Coffey gristmill.

Complaining of this injury alleged thus done him and the resulting damage caused thereby, Wells in May, 1932, filed his suit in equity, wherein he sought recovery of damages in the sum of $1,000 for the appellant company's overflowing and washing his land and destruction of his crops and also for a mandatory injunction requiring the company to remove the dam. Later by amended petitions he alleged that the affairs and business of the appellant company had by an order of the Jefferson circuit court been placed in receivership and that the appellant Percival Moore had been appointed receiver and had duly qualified as such and asked that the said receiver be made a party defendant to this action. Further by a later amended petition he alleged that the new concrete dam was 23 inches higher than the old dam and asked that, in the event the court should hold that the company had the right to maintain the dam across Green river, it adjudge that it had no right to erect and maintain one higher than the old dam.

The company by answer denied the material allegations of the petition and affirmatively pleaded that it was engaged in the business of generating and producing electric current and selling the same to the public at Middleburg and vicinity and for said purpose erected and maintained the dam across Green river at said point to impound the water and generate electric current by water power, but that the old Coffey mill, which was operated by water power, with the dam across the said river at the same point and using the same mill site, was used to operate a gristmill, and that the dam erected by the defendant is in the same place and replaces

the old Coffey milldam; that the right to erect and maintain a dam across Green river at said point and to thereby dam the water in said stream, with the incidental and necessary obstruction of said water and the overflow of lands above said dam, had been established and enjoyed by the owner of said mill site continuously for more than fifty years. By amended answer the company further set out the proceedings had in the Casey county court in the years 1827 and 1830 for the purpose of condemning the land and wherein was acquired the right to erect and maintain for operating a gristmill a dam 9 feet in height. Further it alleged that in the exercise of the right so acquired the dam had been erected and continuously maintained at such height except for the short periods of time required in replacing the dam following its destruction by high water, and that this mill site and dam, together with the right to maintain the dam, had been by mesne conveyances finally transferred to the company by the Oscar C. Wright Company in March, 1929, as above stated.

Upon final submission of the cause upon the pleadings and the voluminous proof taken, the learned chancellor decreed that the defendant company (here the appellant) had no right—under and by virtue of the aforesaid condemnation proceedings, wherein was given the right to construct and maintain a 9-foot dam for gristmill purposes—to erect a dam under such authority for a different use or for power purposes. It was also further adjudged that the defendant had also constructed its new dam 15 inches higher than the maximum height of 9 feet allowed under such earlier proceedings for the erection and maintenance of a dam for gristmill purposes; also, that such illegal 15-inch raise by defendant in the height of the dam had caused the injury to plaintiff's land, crops, and tiling complained of, for which injury he was awarded the sum of $150 in damages; and that the new dam in controversy, to the extent of the 15 inches added to its height, constituted an obstruction in the river, injuriously affecting plaintiff, and the defendant was commanded to remove so much from off the top of the dam as to reduce its height by 15 inches.

Appellant, complaining of this judgment, argues for its reversal: (1) That the company has the right to maintain its dam in Green river for power purposes; (2) that the chancellor improperly exercised its judicial

discretion in directing that the 15-inch top part of the dam be removed; and (3) that the maintenance of the dam had caused no damage to Wells' property.

First discussing appellant's last urged objection, it is to be noted that appellant contends that it has not in fact constructed its new dam with a greater height than was that of the old dam it replaced. As showing this, it states that the rocky river bed upon which it was constructed was first blasted out for a depth of 2 feet, from which point as its foundation it was erected 10 feet 3 inches rather than 9 feet, which was the height of the old dam erected upon a foundation 2 feet higher; but that, conceding arguendo that the new dam was as to its concrete construction 7 inches higher and was by the added log top 8 inches thick, superimposed thereon, made a total of 15 inches higher than the old dam, notwithstanding this, its constructing the dam with such additional height of 15 inches did not cause the overflowing of or damage to the appellee Wells' land or injure his tiling placed thereon. Plaintiff's evidence was to the effect that the new dam was some 2 feet higher than the old, as measured by fragments thereof left along the river, and that such increased height of the dam caused a corresponding raise in the level of the water in the millpond adjacent to and extending beyond plaintiff's land; that such raising of the water level covered the mouth of appellant's drainage tile, thus destroying its suction and making it worthless for the drainage of his low lands adjoining. The evidence for plaintiff was that after tiling his land in 1917, it was thereby seasonably drained and properly cultivated continuously from such time until after the erection of plaintiff's dam; also, that the raising of the water level of the millpond caused a greater amount of its overflow water to back up and flow through and from the adjoining Elliott farm onto and across his land, washing it and destroying its standing crops during the high-water period of July, 1931. Appellant, on the contrary, contends that such damage was not caused by the added height of the new dam because the evidence shows that the plaintiff's land, tiling, and crops were not damaged in any way until some three years after the erection of the new dam or not until it was caused by the extraordinary flood which occurred in July, 1931, when both plaintiff's land and its own dam were deeply submerged with the high flood waters, and which flood

was, according to the testimony of many old witnesses, the worst ever experienced in that neighborhood. Appellant further contends that even if the water level of the millpond had been raised by the dew dam, it still could not be held to have caused the stopping up of the mouth of Wells' drainpipe, since Wells in his own testimony admitted that he had noticed no filling up of the pipe until just before this unusual flood; also a lower neighbor testified that he had constructed a like tile line for draining his lands, which, as laid, had its mouth embedded in the river bank below the river's surface water, which yet was shown to have properly functioned by carrying off the water from the land; that the real cause of the breaking and filling up of Wells' tile was due to his removing its mouth from the concrete bulkhead and suffering it for lack of proper support to become embedded in the mud. Appellant argues, therefore, that such being the evidence it fails to show that the maintenance of the dam, conceding the alleged added height, caused the washing of Wells' land or the stopping up of his tile, but that such injury was caused by the unusual flood, then occurring. The rule as to this is that to make one raising or erecting a dam liable for damage for injury occurring from an extraordinary flood, his negligence or wrong in so doing must have been an active agent in bringing about the loss, without which it would not have occurred. Farnham's Water & Water Rights, vol. 2, p. 1841. The unusual rainfall and wrongful or negligent obstruction of a stream must concur in causing it to overflow its banks, and the person causing the obstruction is liable for the overflow that would not otherwise have occurred. Brink v. Kansas City, St. J. & C. B. Ry. Co., 17 Mo. App. 177; Coleman v. Kansas City, St. J. & C. B. R. Co., 36 Mo. App. 476; Raish v. Orchard Canal Co., 67 Mont. 140, 218 P. 655.

The learned chancellor upon this conflicting evidence concluded that the maintenance of the dam at its present height was unjustified and also was the cause of plaintiff's damage and accordingly adjudged that he recover as such the sum of $150. We are not inclined to disturb the trial court's finding in this, as representing his conclusion based upon the conflicting evidence heard, inasmuch as a substantial part of it supported the judgment. The question here as to whether or not the overflow of Wells' land was caused or made more

destructive or damaging by reason of the alleged raising of appellant's dam was one of fact, the finding of which, where supported by substantial evidence, rested with the chancellor. Chicago, St. L. & N, O. R. Co. v. Adkins, 247 Ky. 241, 56 S. W. (2d) 969.

Appellant next contends that the company had the right as grantee of the mill site, with its rights appurtenant, to erect its dam and to maintain it in Green river at its present height and. that the learned chancellor erred in otherwise holding. In support of this contention it argues that clearly the right to erect and maintain a milldam 9 feet in height was acquired by Coffey, its predecessor in title, in his condemnation proceedings in 1827 and 1830, and that in addition to this legal source of title, the dam has been adversely maintained by the company's predecessors in title for practically one hundred years; also, that the judgment in this case has the effect of limiting the height of the dam to an elevation 7 inches below its present height, the court having, after entering its judgment, entered an order staying the effect of its mandatory injunction on condition that appellant at once remove the 8-inch wooden log on top of the dam, which was removed. Appellant argues that it is difficult to conceive upon what theory the court would justifiably force the company to incur the expense of cutting away this additional 7 inches of concrete from the top of the dam. In this connection it is shown by the agreed statement of facts found in the record that one Jesse Coffey, owning the land on one side of Green river and the bed of the stream at a point where the dam in controversy is located and desiring to erect a dam across the river for the purpose of operating a gristmill, instituted condemnation proceedings to acquire title to one acre of land on the opposite side of the stream and for permission to erect and maintain a nine-foot dam; that these proceedings were had under the then statute law of Kentucky, volume 2, pp. 1212-1217, compiled by Moorehead & Brown and published in 1834; and that in such proceedings the land was condemned and the right given Coffey to erect a dam for gristmill purposes, which he did. The statute referred to, after providing the procedure for condemning property for gristmill purposes, contains the following section:

"Sec. 7. And if the party applying obtain leave to build the said mill and dam, he shall, upon

paying respectively to the several proprietors entitled, the value of the acre located, and the damages which the jurors find will be done by overflowing the lands above or below, become seized in fee simple of the said acre of land; (j) but, if he shall not, within one year thereafter, begin to build the said mill, and finish the same in three years, and afterwards continue it in good repair for public use * * * the said acre of land shall revert to the former proprietor and his heirs * * *."

The appellant relies for its title to this mill site and its right to erect and maintain this dam upon these condemnation proceedings and the rights and privileges obtained thereby, and insists that the same constitutes and gives its ample authority to construct and maintain its dam for the purpose of operating a power plant. It is the contention of Wells, on the other hand, that the company's title to the one acre of land across the river is a defeasible fee and that the appellant, having failed to rebuild the old dam for gristmill purposes within the time fixed by the said statute under which the authority to erect it was acquired, has now lost the right to do so and that the said one acre reverts to the original owner. Not only does appellee contend that the company forfeited its title to the one acre of condemned land across the river, by its failure to begin within one year the rebuilding of the dam for grismill purposes, but further insists that the company has no right to change the purpose or use for which the one acre was originally condemned; that is, that the company has no right to erect and maintain the dam for power purposes when the condemnation proceedings authorizing its taking were for gristmill purposes only. It would seem clear that, under the language of the statute providing for the condemnation of this one acre here involved, upon the condemnor's paying the several proprietors the fixed value of their acre, he should become seized in fee simple of it and that he, upon payment made therefor, acquired such fee-simple title rather than a mere easement in the land so condemned and purchased. Coupled too with this matter of appellant's title is the fact that the said Coffey and his successors in title, down to and including this appellant, have continuously used, occupied, and adversely possessed and controlled this mill site for a period of some one hundred years, during which time the 9-foot dam across the river has been

continuously maintained and operated for the generation of power. Of course, we do not by this intimate that there might not have been only an easement taken to the land with right of reversion in the grantor at some such distant or future date, upon the abandonment of it which would remain effective only as such, but rather do we here conclude that the circumstances and facts attending the original acquirement and continuous subsequent adverse holding of this acre tract, title to which is thus here put in issue, clearly establish the fact that the original condemnor, Coffey, and his successors in title acquired thereby title thereto in fee simple unconditional, or, in the language of the statute, "became seized in fee simple" thereto. Even, however, if such were not the case, we are yet of the opinion that the right to thus question appellant's title would not rest in the plantiff Wells, in that he is not shown to have such interest or privity of interest in the alleged reversionary title to the acre in controversy, acquired either by purchase, inheritance, or otherwise, as in its assertion might authorize him to question appellant's title to this originally condemned one acre, however such reversionary right might be considered were appellant's title here attacked by one holding an interest therein, or standing in privity with its original grantor or his successors in title. Certainly the appellee's position with respect to the appellant's use of this dam remains one and the same, regardless of whether the power generated through its authorized impounding of the water of the stream goes into or is employed for the production of electricity or the grinding of grain. A change made in the use of the water power licensed by the condemnation proceedings is a matter of no concern to appellee, nor does it affect his personal interest or rights, he having bought this land on Green river in 1913, when it was then impressed with the right on the part of the millowner to obstruct the natural flow of the water by a dam of the height and for the purpose authorized. Wells having bought the land from one who had lost the right to object to the erection and maintenance of a dam used for operating a gristmill, he should not now be permitted to enjoin its continued maintenance and use as a means of providing water power for the operation of appellant's electric light plant, unless it be to the extent only of a showing that such change in the erected higher dam now operates to his prejudice by causing a greater obstruction to

the flow of the stream than was originally granted and acquired by the condemnation proceedings had White-hair v. Brown, 80 Kan. 297, 102 P. 783, 18 Ann. Cas. 216. In section 209, 27 R. C. L. p. 1298, it is stated that "one who owns a prescriptive water right may change the use to which it is put at his pleasure so long as the adverse use is not increased," citing Luttrel's Case, 4 Coke, 86a, 10 Eng. Rul. Cas. 294 and note. Even where the right to maintain a dam across a stream and over-flow riparian lands thereby was only a prescriptive one based upon a presumed grant, it was held that such right is not affected by the purpose for which the water power is employed. However, the appellant, as a public service corporation, is by sections 1599b-1 and 1599b-2 of the Statutes authorized "to condemn and take such real estate * * * rights, privileges or easements neces-sary for such dam or dams * * * and the compensation to be paid therefor shall be ascertained and paid in the same manner as provided in sections 835 to 840 inclu-sive, of the Kentucky Statutes for the condemnation of land by railroad companies."

Although the appellant is thus, as a public utility corporation, vested with power as such, under said sec-tions 1599b-1 and 1599b-2 of the Statutes, to acquire by condemnation proceedings mill sites across streams for the purpose of generating electric current and could have, in the exercise of such power, secured the right to erect and maintain for such public purpose a power dam across Green river of the height shown required, it yet failed, either by not instituting such authorized pro-ceedings or by purchase, to first acquire the right to erect or raise its milldam beyond 9 feet, the height au-thorized for the old dam. Therefore, until such steps were taken and compensation paid therefor to the ri-parian owners affected thereby, no rights obtained by the appellant through the fact of its being a public utility, possessed of the power of eminent domain, would prevent the appellee, as an upper riparian owner, from recovering against it for the additional servitude there-by imposed upon his right to have the waters of the river unobstructed in their flow except to the extent such obstruction was caused by the 9-foot dam and licensed by the original grant. The 15-inch additional height at which appellant's present dam was found by the chan-cellor to have been constructed is to the extent of such additional height unauthorized and constitutes an in-

jury to the riparian owner's rights to the extent that such addition adds to the obstruction of the natural flow of the water or the flooding of his lands. Appellant having thus been found by the chancellor to have to such extent injured and damaged the plaintiff by causing a more injurious overflow of his land by reason of this 15-inch addition, here unlawfully made, to the height of the dam, the question next arises: What is the character and measure of plaintiff's remedy therefor; that is to say, is he confined to securing damages as affording adequate reparation for the injuries suffered, or is he entitled, as by the court decreed, also to a mandatory injunction ordering the removal from the dam of this wrongfully added 15 inches to its height or to have the whole dam removed because of appellant's changed use of its water power from the original purpose for which its erection was granted.

In the case of Oechsli et ux. v. Washington Electric R. Co., 89 Wash. 587, 154 P. 1079, 1080, a right of way had been granted to an electric railway company for its use, which it later conveyed to a steam railway company as a right of way for its steam cars. Appellants sued, claiming that such was an unwarranted departure from the original purpose for which the land had been granted. There the court, in discussing and denying plaintiffs' claim, said:

"In any view of the case, the respondent is certainly in no worse position than it would have been had it entered upon the appellants' land and constructed the railroad without any deed but with their knowledge. Being a public service corporation invested with the power of eminent domain, it could not be ejected from the land nor enjoined from the operation of its road. In such a case, under the rule to which this court is committed, the appellants' only remedy would be to recover damages in the value of the land taken and for injury to the land remaining. Kakeldy v. Columbia & P. S. R. Co., 37 Wash. 675, 80 P. 205; Kincaid v. Seattle, 74 Wash. 617, 134 P. 504, 135 P. 820; Thorberg v. Hoquiam, 77 Wash. 679, 138 P. 304; Domrese v. Roslyn [89 Wash. 106], 154 P. 140. But the respondent here entered and constructed its road under a grant of the right of way. Obviously and a fortiori, if it were conceded that it had violated the terms of the grant by permanently abandoning

the intended use of electricity for that of steam, the appellants' remedy would be, as we have said, only the damages, if any, to their land resulting from the added servitude.''

See, also, Cowell v. Thayer, 5 Metc. (46 Mass.) 253, 38 Am. Dec. 400.

This language of the court is strikingly applicable to the situation presented in the instant case. Here it is shown that the appellant has, for the purpose of generating power, built a dam found to be somewhat in excess of the height to which it could at the time lawfully be built. Being a public service corporation, it could (as stated) by initiating proper proceedings, have acquired the right to build a power dam to the height it has here, if necessary, but it has, without first legally acquiring the right, wrongfully so built it and has thereby imposed an additional servitude upon the plaintiff to the extent such addition has caused a further obstruction to the river flow and the overflow of his land. This dam, we further conclude (being one that appellant could have—by exercise of its right of eminent domain, with which invested—acquired the right to construct for its use of creating and distributing electric current for public use) should not be destroyed or ordered removed, it being admittedly a permanent structure erected by a public service corporation.

The rule as to compensating one injured by an overflow of his land, caused by a permanent structure erected by a public service corporation, is thus stated in Louisville & N. R. Co. v. Bennett, 207 Ky. 776, 271 S. W. 71, 72:

"There was therefore no evidence upon which to submit to the jury the question of whether the embankment was temporary or permanent and on which the jury might base a verdict such as it returned, awarding appellee, Bennett, temporary damages, for such damages could flow only from a temporary structure, or from a structure negligently constructed and which might be remedied or corrected at an expense not in excess of the reasonable value of the lands which were caused to overflow, if any overflowed, by the negligent construction of the embankment. The court should not, therefore, have submitted to the jury the question of temporary damages, but should on the facts proven have held as a matter of law that the em-

bankment was a permanent one, and that appellee, Bennett, was entitled to a recovery as for permanent injury, if at all, and so have instructed the jury."

Also again in Shaw v. Morrison, 202 Ky. 357, 259 S. W. 707, was it so held; the court there saying:

"Appellees' answer denies irreparable injury, and avers that the tile was constructed at the instance and cost of the fiscal court for the protection of a fill in the public highway, and that the damage, if any, to appellant's land is small, permanent, and easily ascertainable, and that the appellees are financially able to respond in damages. * * *

"Upon submission, the chancellor found the injury, if any, was not irreparable, refused the injunction, and transferred the cause to the common-law docket to permit plaintiff to assert and try his claim, if any, for damages. Declining to assert damages and electing to stand on his right to injunctive relief, appellant's petition was dismissed, and he has appealed.

"It stands admitted that the injury is permanent, and that appellees are able to respond in damages, and we concur in the chancellor's finding that the injury, if any, is not irreparable, but slight and easily ascertainable.

"Dealing with an analogous situation in Devou v. Pence, 106 S. W. 874, 32 Ky. Law Rep. 697, we held, upon many authorities there cited, that—

" 'As the injury to appellant's property is not an irreparable one, but one for which the damages can be ascertained, and appellees are solvent, she was not entitled to the [injunctive] relief sought.' "

We are therefore of like opinion here, where, under the evidence, there exists no ground for the belief that recovery of damages, once and for all, for the plaintiff's alleged permanent injury caused by the wrongful erection of appellant's permanent structure, will not afford adequate reparation for the additional servitude, if any, imposed upon plaintiff by reason of the 7-inch addition to its concrete dam. Under such circumstances we are inclined to the view that granting a mandatory injunction, requiring its removal, would impose an undue hardship upon the appellant, out of all proportion to

the injury alleged caused plaintiff thereby. The chancellor, being vested with a discretionary power to enjoin in such case, should decline to exercise his injunctive power by directing the partial destruction of the permanent structure, but rather leave plaintiff to a recovery of compensation by damages therefor. In 32 C. J. 77, this rule is thus stated:

"On application for an injunction the court will in the exercise of the wide discretion with which it is vested take into consideration the relative inconvenience or injury which the parties will sustain by the granting or refusal of the application for an injunction, unless in cases where the wrong complained of is so unwarranted and unprovoked as properly to deprive the wrongdoer of the benefit of any consideration as to its injurious consequences. The rule is laid down in a large number of decisions that when the issuance of an injunction will cause great injury to defendant, and will confer no benefit or very little benefit in comparison upon complainant, it is proper to refuse the injunction, especially where the right is doubtful, or where money damages will compensate plaintiff, or where the wrong may be otherwise redressed, or where complainant can at comparatively slight cost protect himself."

In Herr v. Central Kentucky Lunatic Asylum, 110 Ky. 282, 61 S. W. 283, 284, 22 Ky. Law Rep. 1722, the same rule was announced, the court therein saying:

"An injunction ought not to be granted where the benefit secured by it to the party applying therefor is comparatively small, while it will operate oppressively and to the great annoyance and injury of the other party and to the public, unless the wrong complained of was so wanton and unprovoked as to properly deprive the wrongdoer of all consideration for its injurious consequence."

However, we are of the opinion that as to the award made plaintiff of $150 as temporary damages, the judgment should be affirmed, in that the same were in good part caused by the 8-inch log top superimposed upon the dam, which by its removal at a low cost, pursuant to the court's order, was shown to have been but a temporary structure, entitling plaintiff to recovery of the temporary damages awarded him therefor. There-

fore, the judgment of the chancellor in awarding same as temporary damages is affirmed, but in so far as it directs, by mandatory injunction, the abatement of the nuisance by removal of 7 inches of the concrete dam, the same is, for the reasons hereinabove announced, reversed, the plaintiff being left to institute his action, in lieu thereof, for the recovery of permanent damages, once and for all, for such injury as may be shown is suffered by him by reason of the unwarranted 7-inch addition made to the height of appellant's dam.

Therefore, the judgment is, as hereinabove indicated, affirmed in part and reversed in part.