### Sam Warren & Son Stone Co. v. Gruesser et al.

March 26, 1948.

J. J. Kavanaugh for appellant.

Armstrong & Armstrong for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Sam Warren & Son Stone Company is engaged in the business of cutting and dressing stone used principally in building operations. Its plant is located at the corner of Twenty-Fourth and Arbegust Streets in Louisville on a lot which fronts 90 feet on Twenty-Fourth Street and extends west 482 feet to Midway Street. The machinery used to cut and dress the stone is operated by electrical power which is generated on the premises by two Diesel engines. On October 21, 1947, the owners or occupants of fifteen houses located on Howard Street between Twenty-Fourth and Midway Streets brought an action in the Jefferson Circuit Court to abate what they charged was a private nuisance caused by the operation of the two Diesel engines, and they asked that the defendant be permanently enjoined from operating the engines. A large amount of proof was heard, and on November 26, 1947, an order was entered enjoining the defendant from operating a 325-horsepower Diesel engine, but permitting it to continue operation of a smaller 100-horsepower engine. In respect to the smaller engine the judgment provided:

"It is further considered, ordered and adjudged that the defendant may continue to operate its plant by generating electric power with the Fairbanks-Morse Diesel engine unless said operation by this engine shall, in the future, cause any nuisance."

Later the plaintiffs moved the court to extend the order of injunction so as to include the operation of

the smaller engine, and to abate the nuisance occasioned by its use and operation. Further proof was heard, and on December 30, 1947, the order of injunction was extended to include the operation of the Fairbanks-Morse engine. The defendant has appealed, and contends (1) the finding of the chancellor that the operation of the Diesel engines creates a nuisance is contrary to the weight of the evidence, and the company is subjected to such grossly disproportionate hardship that equitable relief should be denied; (2) the plaintiffs have an adequate remedy at law, and the extraordinary remedy of injunctive relief does not lie; and (3) the action is barred by laches and the statutes of limitations.

Appellant's plant has been operated at its present location since 1922. It was owned and operated until 1934 by Sam Warren and his son. They operated the plant with electric current purchased from the Louisville Gas & Electric Company. In 1934 the plant was purchased by Antone Diebold, Sr., his three sons, and John M. Hamman, and the business was incorporated. The new owners dispensed with the use of commercial power, and installed a 100-horsepower Fairbanks-Morse Diesel engine to generate the power to operate the machinery of the plant. In September, 1946, appellant installed a second engine, a 325-horsepower General Motors Winton Diesel engine. Thereafter the two engines were operated alternately, but never at the same time. The appellees charge in their petition that the Diesel engines are in constant operation throughout the day, five and six days a week, and that they create a loud noise and throw off obnoxious gases and odors which enter their homes and the homes of other residents of the neighborhood polluting the atmosphere and producing much discomfort, impairing the use and enjoyment of their homes. They also charge that the operation of the Diesel engines creates and sets up vibrations of the earth and air so that the houses of the plaintiffs and other residents of the vicinity are shaken, jarred and vibrated to the extent that the structures are being seriously damaged, and plaintiffs' right to the peaceful enjoyment and occupancy of their homes is being destroyed. The distance from the engines to the houses occupied by the appellees varies from 120 feet to 412 feet. There was considerable evidence to the effect

that obnoxious gases and odors entered the homes of appellees when the engines were being operated, but most of the evidence was directed to the charge that operation of the engines caused vibrations in the houses on Howard Street. The Fairbanks-Morse engine is a 2-cycle, 2-cylinder, 100-horsepower engine sitting on a concrete foundation which extends about 7 feet into the ground, and the General Motors Winton engine is a 4-cycle, 4-cylinder, 325-horsepower engine sitting on a concrete foundation about 9 feet deep. The evidence for appellant that the engines were installed in the most approved manner and according to the specifications furnished by the Fairbanks-Morse Company and the General Motors Corporation is uncontradicted. Eleven witnesses introduced by appellees prior to entry of the order of November 26, 1947, testified that the engines caused vibrations in their homes. G. L. Carwell resides at 2415 Howard Street, and he testified concerning the noise and vibrations caused by the operation of the Diesel engines:

"It is a vibrating noise that causes the furniture and everything in the house to just jar, and dishes will walk off the table or shelves, and the window weights in the wall will vibrate back and forth and slap on the walls. * * *

"Well, the best I could describe it, it has the same effect of an electric vibrator might have or one you might stand on. You can stand on the floors and the whole house just quivers just like you were on a vibrating machine. That's the best way I can explain it."

He said that fumes from the burning oil entered his home when the engines were running, and that the vibrations caused the plastering to crack and fall. He was asked if the foundation of his house had been damaged, and he answered:

"Yes, I think it has. My doors get out of line and my windows go out of line from the frame sagging and the doors get to where you can't shut them or can't open them if they are shut, and you can plane them up and refit them and in a short time they are that way again."

The testimony of the other plaintiffs who resided on Howard Street was of similar import.

At the conclusion of the plaintiffs' evidence, the defendant's attorney moved the court to enter an order directing that an officer or agent of the defendant and an architect, engineer or builder be permitted to inspect the premises of the owners or tenants who had testified for the plaintiffs, and that the inspection be made between the hours of 8 a. m. and 4:30 p. m. when the defendant's plant was being operated by the General Motors Diesel engine. No objection was made to the motion, and the defendant selected L. S. Churchill, assistant professor of mechanical engineering at the University of Louisville, and Leslie V. Abbott, an architect and designing engineer, to make the inspection. Mr. Churchill testified in part:

"The first place I stopped was the home of Raymond Wilkins, 2407 Howard Street. Mrs. Wilkins at the time invited us in to inspect the house and I found at that time that the entire structure was vibrating rather seriously, dishes were clattering, there was a general vibration of the plumbing in the bathroom, you could feel the vibration from the floor, in sitting in the furniture in the Wilkins home you could feel the vibration transmitted to the furniture, and in general it was rather unpleasant. The Wilkins home, I think we could agree that the vibration is caused by the Winton Diesel engine, if you can accept the statement of Mrs. Wilkins that their home starts to vibrate and stops vibrating simultaneously with the starting and stopping of the engine."

He went in four other houses on Howard Street, but found very little vibration. It was his opinion that the Wilkins house had a natural frequency, the same as the frequency of the vibrations created by the Diesel engine, and that the frequency could be changed and the resonance eliminated by stiffening the structure. He said:

"I believe in the case of the Wilkins home resonance could be prevented and vibration almost entirely stopped by putting additional supports under the floors and perhaps supporting the corner posts of the house."

Mr. Abbott inspected nine houses on Howard Street. He testified that he found a lot of "chatter-

ing" in practically every one of the houses he visited, and, concerning one of the houses, he said: "I found different things vibrating just like in the other houses. In one of those houses, I won't identify each one, was a sink board and this sink board was really going to town, I tell you, it was making a lot of noise." He placed a clothespin behind the sink board and the vibrations stopped. He was asked in one instance if the vibration was not constant, and he said: "Yes, it was constant, and all those vibrations were generally constant, too, there wasn't any getting away from that." He was of the opinion that the chattering caused by the vibrations could be stopped by rearranging the objects in the various houses and by tightening the structures and making them more stable and secure.

The evidence sustains the chancellor's finding that the operation of the Diesel engines creates a nuisance. There can be no doubt that the pulsations or vibrations are set up by the vibrations of the engines, and the evidence strongly supports appellees' claim that these vibrations not only are physically damaging the structures, but are interfering with appellees' comfort and their enjoyment of their homes. Appellant claims that its business is lawful, is conducted in the most careful and prudent manner and therefore, as held in Indian Refining Company v. Berry, 226 Ky. 123, 10 S. W. 2d 630, is not a nuisance and must be endured. It was held in the Indian Refining Company case that a filling station is not a nuisance per se, but a lawful structure necessary in the prosecution of a legitimate business, and that the evidence was not sufficient to show that the injury caused by the prosecution of the business constituted a nuisance in the legal sense.

Ordinarily one has a right to use his property as he sees fit, but a man's dominion over his own premises is qualified to the extent that his use of them must be reasonable and such as not to create a nuisance and thereby deprive neighbors of the enjoyment of their homes. The rule is an expansion of the maxim, sic utere tuo ut alienum non laedas. Appellant invokes the doctrine of "balance of interests," or as it is sometimes called "the balance of conveniences," which is applied by some courts where an injunction will work an undue

hardship on the defendant without corresponding benefit to the plaintiff and substantial redress can be afforded by the payment of money. The doctrine was referred to in Kentucky Electric Development Company's Receiver v. Wells, 256 Ky. 203, 75 S. W. 2d 1088, 1095, where the court quoted the following from 32 C. J. 77:

" 'The rule is laid down in a large number of decisions that when the issuance of an injunction will cause great injury to defendant, and will confer no benefit or very little benefit in comparison upon complainant, it is proper to refuse the injunction, especially where the right is doubtful, or where money damages will compensate plaintiff, or where the wrong may be otherwise redressed, or where complainant can at comparatively slight cost protect himself.' " See, also, 43 C. J. S., Injunctions, sec. 30.

But, in the Wells case, it was held that recovery of damages for the plaintiff's alleged permanent injury would afford adequate reparation. The soundness of the rule invoked by appellant is questionable, but, even where recognized, is applied only under the most exceptional circumstances and then usually on application for a preliminary or temporary injunction. Huebschmann v. Grand Co., 166 Md. 615, 172 A. 227; Benton v. Kernan, 127 N. J. Eq. 434, 13 A. 2d 825; 39 Am. Jur., Nuisances, sections 159 and 160; Annotation in 61 A. L. R. 924; 37 Yale Law Journal 96.

It is said in appellant's brief that here we do not have the closing of a nuisance per se, but the absolute destruction of a lawful, going business with an apparent loss of nearly $200,000 as against a potential damage to appellees of several hundred dollars. We find no support in the record for this statement. There is no evidence as to the value of appellant's plant or the cost of the Diesel engines. It is said in brief that the plant, with land and improvements, is valued at $150,000, and that the Diesel engines, with installation, cost $40,000 to $50,000. The record does show that the Diesel engines were secondhand or used engines when they were purchased and installed in 1934 and 1946. The business will not be destroyed since the plant has been and can be operated by commercial power without creating the nuisance complained of by appellees. It is not the op-

eration of the plant that creates the nuisance, but the method of operation now employed, that is, the use of Diesel engines to generate power to operate the machinery. In Barrett v. Vreeland, 168 Ky. 471, 182 S. W. 605, 610, where the lower court had enjoined the defendant from operating a quarry so as to invade the peaceful, quiet and comfortable enjoyment of the right of plaintiffs to occupy their properties as residences, the circumstances were very similar to those in the instant case, and all of the grounds now urged by appellant for a reversal were adversely disposed of in that case. This court affirmed the judgment enjoining the appellants in that case from operating their quarry by the method theretofore employed, and, after stating that the injunction did not render the appellants' property valueless nor result in financial ruin to them, said:

"The continuous jarring and injury to plaintiff's houses render their occupancy unpleasant as well as, according to the testimony, unhealthful, and their annoyance is not governed by the shifting changes of the wind. * * * Every citizen has a right to the free and unmolested enjoyment of the occupancy of his home, and included in this is the right to freedom from the consequences of any subtle influence being set in motion which interferes with this right, be it visible or invisible, and, as the proof in this case shows, in addition to the casting of rocks upon the premises of some of the appellees, such forcible vibrations in the air were produced by the explosions as to cause the shaking and jarring of their premises, their rights incident to the enjoyment of the property were seriously and irreparably interfered with."

The judgment entered by the circuit court does not prevent appellant from operating its plant in a proper manner, and the evidence fails to show that it is impossible to do so without financial ruin to it.

Appellant cites a number of cases which announce the well-recognized rule that injunctive relief will not be granted where the plaintiff has an adequate remedy at law. Under the evidence here, the nuisance is continuous and seriously interferes with the comfortable enjoyment of their homes by appellees. Under such circumstances relief by injunction is the proper remedy.

Barrett v. Vreeland, 168 Ky. 471, 182 S. W. 605; Rogers v. Gibson, 267 Ky. 32, 101 S. W. 2d 200; Hall v. Budde, 293 Ky. 436, 169 S. W. 2d 33, 167 A. L. R. 1361.

The claim of appellant that it has a prescriptive right to operate the Diesel engines has no application under the facts. Even if it be conceded that the right to maintain such a nuisance could be acquired by prescription, the prescriptive period has not elapsed. Nor is the defense of laches available to appellant. There is no element of estoppel, and mere delay in asserting one's rights does not constitute laches in a case of this kind. Barrett v. Vreeland, 168 Ky. 471, 182 S. W. 605; Annotation in 6 A. L. R. 1098.

The judgment is affirmed.