Dussell *v.* Kaufman Construction Co., Appellant.

370

Argued November 16, 1959. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and McBride, JJ.

reargument refused February 15, 1960.

*Herbert A. Barton,* with him *Swartz, Campbell & Henry,* for appellant.

*Benjamin Kuby,* with him *Klovsky and Kuby,* for appellees.

Opinion by Mr. Justice Musmanno, January 18, 1960:

In May, 1955, the Kaufman Construction Company contracted with the Delaware River Port Authority to construct the Philadelphia approach for the magnificent Walt Whitman Bridge which now spans the Delaware River joining Philadelphia to Camden, New Jersey. In order to lay the foundation for the roadway

leading to the bridge, it became necessary to drive piles into the terrain some 36 feet below the surface. The operation of pile-driving is an earth-shaking affair, and this is inevitably so since it involves the violent displacement of soil. The distance that the vibrations radiate from the focal attack depends on many factors: the diameter of the earthly perforation, the type of the pile which is being driven, and most of all, of course, the mechanical force being used to propel the pile downward. The equipment used here was a steam hammer with a ram weight of 5000 pounds, and a drop of 3 feet 3 inches, producing a driving force of 16,000 pounds of energy on each blow, operating at an average of 60 blows per minute.

It was testified and not controverted that the vibrations from the pile driving affected the ground for at least 25 feet in every direction. Within this affected area to the north of the defendant's right of way rested three houses which suffered considerable damage as the result of the subterranean borings. The houses were of the row type. One, located at 3019 South 15th Street, was owned by Sara Larmer and directly adjoined the bridge approach. Another, at 3017 South 15th Street, attached to the Larmer property and, in part, supported by it, was owned by Margaret Davis. The third fronting at 3016 South Carlisle Street, was located immediately behind the Davis property and was owned by Leonard and Winona Dussell. These owners brought an action in trespass against the Kaufman Construction Company and the case, tried without a jury before Judge GUERIN of the Court of Common Pleas No. 4 of Philadelphia County, ended in verdicts in favor of the plaintiffs. The defendant appealed, asking for judgment n.o.v.

In their complaint the plaintiffs charged that the defendant was responsible in damages for one or more of three reasons: (1) negligence in performing the pile-

driving operation; (2) pile-driving is an ultra-hazardous activity which imposed on the defendant absolute liability for all resulting damage; (3) the defendant operated and maintained a nuisance. We do not need to consider reasons 2 and 3 because the record quite clearly establishes that the Trial Court was justified in concluding that the defendant performed its work in a negligent manner.

Before initiating its project, the defendant sent a professional engineer to inspect, and take photographs of, the plaintiffs' properties, both within and without. It thus became thoroughly acquainted with the three houses, their construction, solidity or fragility, proximity to the line of the intended borings and their prospects of withstanding the subterranean violence with which they were soon to be assaulted. The defendant knew, as a result of this detailed inspection and examination, that suitable precautions had to be taken to avoid damaging these dwellings which were obviously not Gibraltars of structural formidableness. They were modest two-story-and-basement brick residences at least thirty years old and built over filled-in land. The defendant knew that the pile-driving would penetrate below the level of their foundations which had a depth of only 8 feet five inches. It knew that it intended to bore to a depth of 36 feet, obviously far below the stratum of land which supported the structures above.

In addition to these physical realities, the defendant was on notice from the Port Authority as to its responsibilities. One of the specifications of the contract with the Authority provided that: "The contractor shall exercise every precaution to see that no injury is done to any existing structure due to his operations."

The contract said further: "Piles shall be driven well in advance of the filling and must be completed in units of work satisfactory to the engineers so that filling and driving operations will not be carried on

simultaneously or performed in such manner that the vibration or shock from the driving will affect the setting or integrity of the concrete in shells being filled. In general, piles shall not be filled when within fifty feet of driving operations."

This provision obviously projected the scientific deduction that to pour concrete within 50 feet of piledriving would deleteriously affect the concrete pouring and hardening. It inferentially also served notice that other objects within that distance faced peril of disintegration.

Nevertheless, in spite of all these signs, portents, admonitions and warnings, the defendant drove piles as close as 2 feet from the Larmer property and 17½ to 29½ feet from the Dussell and Davis properties. Taking no precautions to avert what would as assuredly happen as the workings of the law of gravitation, the defendant proceeded with its pile driving in a manner which caused the houses under consideration to tilt, subside, and buckle.

Without specifying in detail what happened to each particular house, it may be stated generally that walls cracked, joists loosened, concrete surfaces split, plaster broke, wallpaper parted, floors sagged and in many other ways the three dwellings suffered structural strain and breakage. One witness stated that the pile driving "sounded like a bomb or something was going off. The whole house shook." This same witness said of the Larmer home that: "Well there was a crack in almost every room and ceiling, she had a nice living room ceiling and now it looks like a jigsaw puzzle or something, it is all cracked, and the floors, she had nice sanded good looking floors and now you feel like you are walking in a fun house or something. You feel like you are on an angle." Mrs. Larmer testified that her gas refrigerator ceased functioning, and in December, 1957, she and her family had to leave the house because of the lack of heat.

The defendant contends that it is innocent of liability because "the pile driving was done in the regular and normal way that pile driving is done and in the usual accepted manner," and that it was "made just as nice a job as all pile drivers make." This advocacy is scarcely sufficient to exculpate the defendant because it is by no means one of the eternal verities that all pile drivers make a "nice job."

Burns Lafferty, experienced builder and contractor, testified that, given the location and the state of the plaintiffs' properties, the defendant should have shored up the houses in anticipation of its earth-jarring work. He said: "If I had been asked to guarantee the safety of 3019 South 15th Street prior to the bridge approach I would have had no other alternative except to use underpinning." But the defendant did no underpinning.

Mr. Lafferty also testified that vibrations could have been reduced or practically eliminated by use of the "jacking method" of pile driving. While the description of this "jacking" method left something to be desired, the defendant's explanation for its failure to use the process challenges credulity. John Lear, the defendant's engineer, testified: "Piling with a hydraulic jack would cost more than the new bridge would cost." When a statement is of such obvious exaggerated proportions that it enters into the realm of flamboyant and reckless utterance, it may be ignored as an expression of petulance, irresponsibility, or unrestrained partisanship. Lear's remark might well fall into that classification.

Section 822 of the Restatement, Torts, provides: "The actor is liable in an action for damages for a nontrespassory invasion of another's interest in the private use and enjoyment of land if, (a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and (b) the invasion is sub-

stantial; and (c) the actor's conduct is a legal cause of the invasion; and (d) the invasion is either (i) intentional and unreasonable; or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct."

The defendant here is clearly liable under subsection (d)(i). The Trial Judge's finding that the defendant's invasion of plaintiff's rights was intentional and unreasonable is supported by the record. This does not mean that the defendant set out maliciously to wreck the plaintiffs' houses, nor need it be proved that the defendant was animated by ill will. A person may be so devoid of care in his actions, so destitute of concern for the rights of others, and so headstrong in proceeding in the face of known danger to those in his path, that the law is justified in assuming that his conduct, in the wording of the Restatement, is "intentional and unreasonable."

A pile driver, when properly harnessed and kept within the channel of its legitimate functions, is, like a steam shovel or a bulldozer, a mastodonic mechanical creature assisting man in laudable conquest over obstacles holding back worthy enterprises in civilization's progress, but a bulldozer, with an unsteady hand at the wheel, can leave its prescribed route of travel and reduce adjoining structures to tin and kindling wood. The vibrations of a pile driver can be as damaging as the gigantic blade of the bulldozer if the operator ignores the existence of structures within the sweep of its invisible fulminations.

A giant striding by a kindergarten school should tread softly. A pile driver operating in the vicinity of frail and unsubstantial structures should restrain or mask its thunderous blows to the extent necessary to avoid inflicting avoidable damage.

The fact that the pile driver itself did not come into physical contact with the plaintiffs' houses does

not exonerate it from responsibility. Its invisible tentacles of terrestrial violence struck at the houses as certainly as a cannon shot hits its target. A pile driver whose operator ignores the presence of dwellings within the periphery of its vibrations is as responsible for the resulting damage as the bulldozer which leaves the road and knocks down adjoining buildings.

The defendant in this case knew that the vibrations of its pile driver would shake the homes of the plaintiffs. On this subject the trial Judge well said: "If this were not so, why did it go to the trouble of taking extensive photographs of both the interior and exterior of plaintiff's properties? It is our opinion that it took such photographs in anticipation of such a suit as this because it knew that vibrations from its pile-driving would be felt 25 feet away, and that as a consequence thereof, damages to the adjoining properties were a certainty to occur." The defendant probably hoped to show by the photographs that the condition of the houses, after the pile driver's passing, was not much worse than before it appeared on the scene. The pictures failed to fulfill those hopes, if they were entertained.

The Trial Judge was justified in concluding that the defendant's conduct was "both negligent and reckless," as well as "incompetent and unskillful." We also affirm the Trial Judge's conclusion that: "It is apparent that defendant's actions were not a mere inadvertence, but a conscious disregard of plaintiffs' property interest, and for the damage thereto it must stand liable."

The defendant argues: "The pile driving certainly cannot be termed an unwarranted or unlawful use of the right of way being exercised by the Port Authority through its contract *in the construction of a public improvement*." (Emphasis in defendant's brief).

In support of this assertion, the defendant maintains that it is protected by the doctrine of *damnum absque injuria* and cites the case of *Hauck v. Pipe Line Co.,* 153 Pa. 366, where this Court said: "The railroad companies in those cases [Railroad Company v. Lippincott, 116 Pa. 472, Railroad Company v. Marchant, 119 Pa. 541] were clothed with the right of eminent domain, and were expressly authorized by law to construct their roads and operate them. It was held, therefore, that any injury resulting from such operation, without negligence and without malice, was damnum absque injuria."

But it is to be noted that in the quotation cited from *Hauck v. Pipe Line* the Court held in the given illustrations that the operations complained of were "without negligence and without malice." In the instant case, negligence was proven abundantly. Consequently, the doctrine of *damnum absque injuria* has no application here.

Of course, it is not to be questioned that the defendant had the right to do its work. The bridge had to be built, the approaches had to be constructed, and the piles had to be driven, but all this could be done contemporaneously with the use of due care in protecting the property of the plaintiffs and, to the extent that the defendant failed in doing this, it is liable in damages. In 1860 this Court affirmed a judgment in favor of a property owner who suffered a loss when the defendant, although engaged in a lawful activity, accomplished an unnecessary harm to the plaintiff. The defendant in that case (*Kissecker v. Monn,* 36 Pa. 313) was authorized (by covenant) to enter upon the plaintiff's property to remove obstructions from a mill race which operated the defendant's mill. To get to the obstructions it took down the water gate but failed to restore it after the work was done. This opened the plaintiff's lands to the defendant's hogs which rooted

into the plaintiff's meadows committing all manner of swinish depredation. At the trial, the judge charged the jury: "We have already said that the defendant had the right of entry, and there can be no recovery here, unless he exceeded the license, or abused his authority. If he did, he must be treated as if he had entered without license. If the defendant took down the gate, and refused or neglected to restore it to its place again, after the necessity for its removal was gone, and his swine entered the meadow at that point, and committed the injuries complained of, then he did abuse his authority, and the plaintiff is entitled to recovery."

The defendant in this case had the right to drive pile but to the extent that it accomplished its work in a manner destructive of the plaintiff's rights, it abused its authority and, in the words of the *Kissecker* case, it "must be treated" as if it had done its work "without license."

The defendant contends that if it is held liable for a nontrespassory invasion of the plaintiffs' property, the amounts of the verdicts entered by the court below for that invasion were excessive. The measure of damages in cases of this character is the cost required to restore the damaged buildings to their pre-tortious condition, unless the cost of repair exceeds the market value in their undamaged state. The property owner is also entitled to compensation for the discomfort and inconvenience caused him during the period his house was disabled and not comfortably habitable.

The lower Court found that, because of the physical damage done the three houses, the plaintiffs were entitled to the following sums: Dussell property, $4500; Larmer property, $4100; Davis property, $3700. We have examined the record and studied the arguments advanced in behalf of and against the reasonableness of these sums. We are satisfied that the Trial Court did not abuse its discretion in reaching the announced

figures and no point would be served in burdening this Opinion with a mathematical and repair-cost analysis of these figures.

The defendant seems to be of the impression that the houses would eventually have subsided of their own weight, regardless of pile driving because they were built on filled-in ground, and therefore, it should not be responsible for what was naturally inevitable. The Trial Judge did not find this assertion to be predicated on fact, but even if the houses had been settling for years this would not constitute an invitation to the defendant to smash them further into the earth with a pile driving hammer. A gradual and natural subsidence might not affect the staunchness and livability of a house for a lifetime, but a subsidence induced by the application of violence could wreck it in the matter of days or even hours. However, regardless of the condition of the houses, their owners were entitled to enjoy them unhampered and unhammered by others.

In the famous English case of *Hoare and Company v. McAlpine,* [1923] Chancery Division 167, an "ancient hotel" in London was so damaged by pile driving done across the street in the erection of a large building that it had to be condemned and demolished. Its owners brought an action against the builders of the modern structure who defended on the basis that the hotel was old and decrepit. The language employed by Judge Astbury in awarding damages to the hotel owners could well apply here: "It is true that it [the hotel] was old and, as compared with younger buildings whose constitution had been strengthened, reinforced or originally produced in accordance with the experience of modern building science, more or less infirm, but it was built in accordance with principles prevailing at the date of its original construction, and it was altered

many years ago in accordance presumably with the Metropolitan Building Regulations . . . and I see no justification for its being physically shaken in its declining years to a premature and untimely end by an adventurous and powerful neighbour . . ."

The plaintiffs were entitled to live in their homes unaffected by the defendant's operations. The houses were not prodigies of comfort nor steel-bound, marble-clad mansions of architectural beauty but they were home and, therefore, sacred to their owners. In his classic defense of one's home, which we have accepted not only with sentimental appreciation, but with legalistic approval, Sir William Pitt said: "The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storms may enter, the rain may enter,—but the King of England cannot enter; all his forces dare not cross the threshold of the ruined tenement."

What the forces of government may not do with soldiers, the forces of the machine age may not do with impunity. In *Sam Warren & Son Stone Co. v. Gruesser et al.,* 307 Ky. 98, the Court of Appeals affirmed the enjoining of the operation of a diesel engine whose vibrations disturbed houses 120 to 412 feet away. The Court said: " 'The continuous jarring and injury to plaintiff's houses render their occupancy unpleasant as well as, according to the testimony, unhealthful, and their annoyance is not governed by the shifting changes of the wind . . . *Every citizen has a right to the free and unmolested enjoyment of the occupancy of his home, and included in this is the right to freedom from the consequences of any subtle influence being set in motion which interferes with this right, be it visible or invisible.*' " (Emphasis supplied.)

The overall damages in this case were of a nature peculiar to the special circumstances involved, and were justly assessed in the Court below.

Judgments affirmed.

Mr. Justice BOK concurs in the result.